UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| Estate of William E. Williams, et al., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 2:12-cv-00324-JMS-DKL |
| | ) | |
| Indiana State Police, et al., | ) | |
| Defendants. | ) | |

**AMENDED ORDER**[1]

Law enforcement officers from various agencies were dispatched to the residence of

William Williams after his family members called 9-1-1 because they believed Mr. Williams was

suicidal.  When law enforcement officers arrived at Mr. Williams' residence, they found him

locked in his bathroom in a suicidal and intoxicated state, and he was threatening to kill anyone

who entered.  The officers made the decision to open the bathroom door and subdue Mr.

Williams with two tasers.  Neither of the tasers had any apparent effect on Mr. Williams.

Tragically, he then advanced on one officer with at least one twelve-inch knife, which led three

officers to shoot Mr. Williams.  The shooting proved to be fatal.  Following his death, Mr.

Williams' estate and his two sons brought this suit against the five officers who were at the scene

and their respective employers.

Presently pending before the Court are four Motions for Summary Judgment filed by (1)

Defendants Putnam County Sheriff Steve Fenwick and his Deputy John Chadd,[2] [Filing No. 75];

---

[1] The Court issues this Amended Order solely to address whether the Court should properly
exercise supplemental jurisdiction over Plaintiffs' state-law claims.  In Part III.C below, the
Court concludes that it should exercise its supplemental jurisdiction over Plaintiffs' state-law
claims.  The addition of the section addressing supplemental jurisdiction is the only change the
Court made to its Order dated June 11, 2014.   An Amended Final Judgment will issue
accordingly.

(2) Defendant Town of Cloverdale ("Cloverdale"), [Filing No. 80]; (3) Defendants Indiana Department of Natural Resources ("IDNR"), Indiana State Police ("ISP"), IDNR Officers Patrick Labhart and Chris Springstun, and ISP Officer Brian Thomas, [Filing No. 82]; and (4) Defendant Cloverdale Police Department Officer Charles Hallam, [Filing No. 84].  Also pending is a Motion to Strike filed by Defendants Chadd and Fenwick.  For the reasons that follow, all four Motions for Summary Judgment are **GRANTED** and the Motion to Strike is **DENIED**.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

---

[2] The Court recognizes that Defendant Chadd is a Sheriff's Deputy, but for ease of reference, the Court refers to all of the law enforcement personnel sued in their individual capacities as "Officer."

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

# II.
## FACTUAL BACKGROUND AND EVIDENTIARY OBJECTIONS

### A. Factual Background

The parties present the Court with an extensive arsenal of evidence in support of their respective positions. The following factual background focuses on the evidence that is either directly relevant to deciding the issues presented, or is otherwise necessary to provide a full narrative of the events in question. Important factual disputes are highlighted throughout, and the facts are construed in the light most favorable to Plaintiffs, when supported by admissible evidence.[3]

### 1. Mr. Williams' Text Message to His Son and His Son's Arrival at Mr. Williams' Residence

On January 15, 2012, then 16-year-old Jacob Williams received a text message from his father, William Williams, which stated, "Wish you the best. Love you." [Filing No. 77-16, at ECF p. 5.] Concerned that his father might be contemplating suicide, Jacob, then at his Aunt Kim Williams' house, called his 19-year-old brother Tyler and told him to go immediately to their father's house, and then Jacob himself proceeded to the house.[4] [Filing No. 77-16, at ECF

---

[3] Defendants contend that Plaintiffs' Statement of Material Facts in Dispute section includes improper "argument, commentary on asserted facts, inferences, conclusions, and speculation." [Filing No. 115, at ECF p. 2; Filing No. 116, at ECF p. 6.] Plaintiffs respond that "[m]ost of the allegedly argumentative language is meant only to explain why [factual] disputes exist," and "this language is necessary to inform the Court what facts are truly disputed and why." [Filing No. 124, at ECF p. 2.] For the most part, the Court agrees with Plaintiffs that most of their statements are properly directed toward the factual disputes they contend are present. However, a limited number of statements in Plaintiffs' Statement of Material Facts in Dispute section stray beyond these purposes. In such instances, the Court will not consider the improper arguments. *See Bryan v. Greeson*, 2010 WL 3522953, *3 (S.D. Ind. 2010) ("To the extent that Plaintiff's [Statement of Material Facts in Dispute section] is argumentative, the Court will disregard those statements in determining whether a genuine issue of material fact exists.").

[4] For clarity, the Court will refer to several of Mr. Williams' family members by only their first names.

p. 5.] On the way to his father's house, Jacob called 9-1-1, but before the call was complete, his phone disconnected. [Filing No. 77-16, at ECF p. 6.]

Jacob arrived at the house without regaining contact with emergency services. Although his father's house was locked when he arrived, Jacob was able to gain entrance through the patio door. [Filing No. 77-16, at ECF p. 6.] Jacob broke through the locked bedroom door, and made contact with his father, who was locked in the bathroom that was connected to bedroom. [Filing No. 77-16, at ECF p. 6.] Mr. Williams told Jacob that if Jacob "came in [the bathroom] he would kill [him]." [Filing No. 77-16, at ECF p. 6.]

Jacob did not attempt to enter the bathroom at that time. Instead, Jacob confirmed that his father was standing up and still talking, which led Jacob to believe his father "was okay." [Filing No. 77-16, at ECF p. 6.] Jacob then unlocked the doors to the house. [Filing No. 77-16, at ECF p. 6.] Around that same time, Kim and Kim's then-boyfriend, "Dozie," were pulling up to the house. [Filing No. 77-16, at ECF p. 6.] As they were arriving, the 9-1-1 dispatcher called Jacob back, and Jacob answered the call. [Filing No. 77-16, at ECF p. 6.]

Over the course of Jacob's conversations with the dispatcher, Jacob told her that his father was "probably going to shoot himself." [Filing No. 77-16, at ECF p. 6.] The dispatcher could hear Mr. Williams in the background saying, "Open that door, I'll f***ing kill you." [Filing No. 77-16, at ECF p. 6.] Jacob also stated to the dispatcher that his father said that "if I open the door, he's going to stab me." [Filing No. 77-16, at ECF p. 6.]

The dispatcher then radioed available law enforcement units, informing them that there was an individual threatening suicide with a gun. [Filing No. 77-1, at ECF p. 2.] Officer Chadd of the Putnam County Sheriff's Department responded to the dispatcher, requesting additional information on the suicidal individual. [Filing No. 77-1, at ECF p. 2-3.] The dispatcher

informed Officer Chadd that the individual was Mr. Williams and that she overheard Mr. Williams state, "If you come through that door I will kill you." [Filing No. 77-1, at ECF p. 3.] Officer Hallam of the Cloverdale Police Department heard the dispatcher's report and radioed Officer Chadd, asking if he too should respond to the call. [Filing No. 77-1, at ECF p. 3.] Officer Chadd informed Officer Hallam that he was going to respond, but Officer Hallam also proceeded to Mr. Williams' residence. [Filing No. 77-1, at ECF p. 3.] While in route to Mr. Williams' residence, Officer Chadd radioed the ISP for assistance, and ISP Officer Brian Thomas stated that he would head to Mr. Williams' residence to provide assistance. [Filing No. 77-1, at ECF p. 3.]

In a subsequent call with Jacob, the dispatcher asked Jacob to go out onto the street and wave down the officers who were dispatched to the scene. [Filing No. 77-16, at ECF p. 7.] Jacob eventually flagged down at least one officer, and he never reentered the house for the remainder of the evening. [Filing No. 77-16, at ECF p. 7.]

In the meantime, before any police officers had arrived, Kim and Dozie entered the house to try and talk to Mr. Williams. [Filing No. 77-18, at ECF p. 3.] Like Jacob, Kim communicated with Mr. Williams, but he remained locked in the bathroom. [Filing No. 77-18, at ECF p. 3.] Kim then called Pat Setty, Kim and Mr. Williams' mother, and told her to call 9-1-1 to make sure that an ambulance was on the way to Mr. Williams' residence. [Filing No. 77-18, at ECF p. 4.] Kim also told her mother that Mr. Williams had cut his wrists, and Ms. Setty called 9-1-1 and relayed this information to the dispatcher. [Filing No. 77-19, at ECF p. 6.] The dispatcher then informed Officers Chadd and Hallam that Mr. Williams may have cut his wrists, but that, despite earlier reports, she did not think there were firearms in the residence. [Filing No. 77-1, at ECF p. 4; Filing No. 86-9, at ECF p. 59.]

### 2.   *Law Enforcement Arrives at Mr. Williams' Residence*

Officer Hallam was the first law enforcement officer to arrive at Mr. Williams' residence, arriving immediately after Ms. Setty.  [Filing No. 77-19, at ECF p. 6-7.]  Shortly thereafter, Officer Chadd arrived on the scene.  [Filing No. 77-1, at ECF p. 4.]  As Officer Chadd was arriving, he told the dispatcher to instruct the ambulance, which was by then parked nearby, to move closer to Mr. Williams' residence.  [Filing No. 77-1, at ECF p. 4.]  He also requested that the dispatcher contact the Putnam County Sheriff Department's negotiator, Officer Nate O'Hare, and send him to Mr. Williams' residence, but the dispatcher responded that she was unable to reach Officer O'Hare after two attempts.  [Filing No. 77-1, at ECF p. 4.]  Officer Chadd entered the residence and spoke with Mr. Williams' family members, who informed him that Mr. Williams had knives but was not believed to have any firearms.  [Filing No. 77-1, at ECF p. 5.]

Officer Patrick Labhart of the IDNR heard the police radio communications and decided to assist the other officers at Mr. Williams' residence.  [Filing No. 77-27, at ECF p. 3-4.]  He was the third law enforcement officer on the scene.  [Filing No. 77-27, at ECF p. 4.]  Officer Chadd informed Officer Labhart that Mr. Williams was barricaded in his bathroom and threatening suicide, and that Officer Chadd did not believe there were any guns in the bathroom, but that he did believe there were knives.  [Filing No. 77-27, at ECF p. 4.]

Officer Chadd then decided to investigate whether the officers could see into the bathroom from an exterior window.  [Filing No. 77-1, at ECF p. 5.]  He went outside and located an octagonal window through which he thought he would be able see into the bathroom.  [Filing No. 77-1, at ECF p. 5.]  Ms. Setty helped Officers Chadd and Labhart get a stepladder from the garage so that they could see into the window.  [Filing No. 77-19, at ECF p. 10.]  According to Officer Labhart, he climbed the ladder while Officer Chadd was still outside with him, and

Officer Labhart could see the top of someone's head through the bathroom window. [Filing No. 77-27, at ECF p. 5.]

At this time, ISP Officer Brian Thomas arrived on the scene and was apprised of the situation. [Filing No. 77-31, at ECF p. 3.] Officer Chadd went back inside the residence, while Officer Labhart repositioned the ladder to get a better angle of vision. [Filing No. 77-27, at ECF p. 5.] When Officer Labhart climbed the ladder the second time, he stated that he could see "blood splattered" on the bathroom door and mirror. [Filing No. 77-27, at ECF p. 5.] Officer Thomas also climbed the ladder and stated that he could see blood splattered on the wall or the vanity.[5] [Filing No. 77-31, at ECF p. 3-4.]

---

[5] Plaintiffs contend that the officers could not see into the window and, more specifically, that they could not see splattered blood. [Filing No. 100, at ECF p. 10.] To establish this, they rely solely on Tyler's testimony (who, as discussed further below, had not yet arrived at Mr. Williams' residence when the officers were attempting to look through the exterior bathroom window). [Filing No. 100, at ECF p. 10.] Tyler attested that when he arrived on the scene and was approaching the house, he was told by an unspecified person that "they could not see through th[e] [bathroom] window." [Filing No. 101-17, at ECF p. 12.] Tyler also offered his opinion that the officers would have been unable to see into the window because the ladder they used "was not remotely close to sufficient height, unless they were standing on the very top rung." [Filing No. 101-17, at ECF p. 12.] Moreover, Tyler stated that the exterior bathroom window usually "fogs up" in the winter, and thus it was unlikely that anything could be seen from outside. [Filing No. 101-17, at ECF p. 13.]

The Court cannot conclude that this evidence places whether Officers Thomas and Labhart saw into the bathroom in dispute. The statement of an unidentified person that they could not see through the bathroom window is inadmissible hearsay and cannot be considered. Tyler's opinion that the ladder was not tall enough unless one stood on the top rung—which very well could have happened given that the record is silent on the matter—does not place in dispute the direct evidence from Officers Labhart and Thomas that they could see in the window. [Filing No. 77-27, at ECF p. 5; Filing No. 77-31, at ECF p. 3-4.] Finally, Tyler's statement that the window in question typically "fogs up" in the winter does not place in dispute Defendants' evidence, as there is no evidence from anyone with personal knowledge that the window was actually "fogged up" on the day in question.

In any event, what is undisputed is that dispatch informed the officers that Mr. Williams had cut his wrists, [Filing No. 77-1, at ECF p. 4; Filing No. 86-9, at ECF p. 59], and, as discussed below, that Mr. Williams' subsequent statements to his son confirmed to the officers

While the other officers were outside, Officer Hallam remained in the residence and made contact with Mr. Williams. [Filing No. 81-3, at ECF p. 3.] Officer Hallam testified that his exchange with Mr. Williams was as follows: "I approached the area and I basically said, 'Bill, what's going on?' And there was a pause, and he said, 'Who the f*** are you?' And I said, 'Charlie Hallam with the Cloverdale Police Department. I'm here to see what's going on. How are you doing?' [He responded,] 'Get the f*** out of here. Get the f*** out of my house. Leave me alone.'"[6] [Filing No. 81-3, at ECF p. 3.] Mr. Williams then threatened to stab Officer Hallam or anyone else who opened the door. [Filing No. 86-9, at ECF p. 59.]

---

that he had in fact done so, [Filing No. 101-17, at ECF p. 10.]. Moreover, Officers Thomas and Labhart told the other officers that they observed blood in the bathroom, and this report factored into the Defendants' later decision making. [Filing No. 81-3, at ECF p. 5; *see* Filing No. 77-1, at ECF p. 5; Filing No. 77-27, at ECF p. 5.] And, in fact, when the bathroom door was eventually opened, the officers could clearly see blood all over the bathroom sink. [Filing No. 77-6.] Therefore, even if Officers Thomas and Labhart could not see into the bathroom through the exterior window, this fact is immaterial because it is undisputed that the officers gleaned that same information—that Mr. Williams had cut himself—from several other sources.

[6] Plaintiffs vigorously dispute that Officer Hallam ever communicated with Mr. Williams, arguing that such communication is "in contradiction with all other actions of both [Officer] Hallam and the other officers during the entire incident." [Filing No. 100, at ECF p. 18.] Plaintiffs rely on two categories of evidence to dispute whether this communication occurred. First, they cite deposition testimony from the four other officers who were on the scene at the time reflecting that none of them heard Officer Hallam communicate with Mr. Williams. [Filing No. 100, at ECF p. 18 (citing Filing No. 101-7, at ECF p. 7 (Officer Chadd); Filing No. 101-12, at ECF p. 8 (Officer Labhart); Filing No. 101-14, at ECF p. 16 (Officer Springstun); Filing No. 101-15, at ECF p. 8 (Officer Thomas)).] But this is consistent with Officer Hallam's testimony that he spoke with Mr. Williams alone and thus does not place the fact of the conversation in dispute. Moreover, while no one else heard this conversation, at least three of the officers testified that Officer Hallam informed them that he spoke with Mr. Williams. [*See* Filing No. 101-7, at ECF p. 7 (Officer Chadd); Filing No. 101-12, at ECF p. 8 (Officer Labhart); Filing No. 101-14, at ECF p. 16 (Officer Spingstun).]

Second, Plaintiffs point to the fact that, when the officers subsequently instructed Tyler to communicate with his father, the officers told Tyler to not "let his father know that any law enforcement was present and was told to talk loudly to cover noises made by the other officers." [Filing No. 100, at ECF p. 18 (citing, *e.g.*, Filing No. 101-18, at ECF p. 5).] But this fact too does not dispute Officer Hallam's testimony that he had the foregoing conversation with Mr.

After this exchange, and as Officer Chadd was re-entering the residence, Officer Hallam radioed that Mr. Williams was becoming increasingly agitated. [Filing No. 77-1, at ECF p. 5; Filing No. 81-3, at ECF p. 4.] Officer Hallam informed the other officers and dispatch that he was going to keep his earpiece in but that the other officers were going to turn their radios down so that Mr. Williams did not hear them and become even more agitated. [Filing No. 77-1, at ECF p. 5.]

When Officer Chadd reentered the residence, he and Officer Hallam had a brief conversation with Ms. Setty, at the end of which they asked her to exit the residence. [Filing No. 77-19, at ECF p. 9.] On her way outside, Officer Thomas stopped her and said, "When the time comes that we need to get your son help, how do we open the bathroom door?" [Filing No. 77-19, at ECF p. 9.] Ms. Setty went back inside and retrieved a Q-Tip, broke one end off, and explained to Officer Thomas how he could pop the bathroom door unlocked using the broken Q-Tip. [Filing No. 77-19, at ECF p. 9.]

All of the officers then met up in the residence. [Filing No. 81-3, at ECF p. 5.] Officer Labhart reported to Officer Chadd that they saw a lot of blood inside the bathroom through the

---

Williams. Given that Officer Hallam's conversation with Mr. Williams made Mr. Williams "agitated," the officers testified that they were concerned that further recognition of their presence in the residence would only serve to increase Mr. Williams' agitation. [*See* Filing No. 101-7, at ECF p. 7; Filing No. 101-12, at ECF p. 8; Filing No. 101-14, at ECF p. 16.] Again, this evidence is not inconsistent with the conversation occurring. The same reasoning explains Officer Chadd's statement to Tyler when Tyler first arrived—which, importantly, was after Officer Hallam's conversation with Mr. Williams—to keep his voice down because "[Mr. Williams] doesn't know we're here." [Filing No. 101-17, at ECF p. 9.] This statement as well is not inconsistent with the evidence that Officer Hallam spoke with Mr. Williams: Mr. Williams only knew that Officer Hallam was at the residence, and Officer Chadd did not want Mr. Williams to know that even more officers were present. Moreover, the conversation occurred before Tyler arrived at the residence, making it impossible for him to have personal knowledge regarding whether the conversation at issue occurred. Accordingly, Plaintiffs have failed to genuinely dispute this fact.

exterior window.  [Filing No. 81-3, at ECF p. 5; *see* Filing No. 77-1, at ECF p. 5; Filing No. 77-27, at ECF p. 5.]  The officers discussed their options of how best to proceed.  [Filing No. 81-3, at ECF p. 6.]  They were unsure how injured Mr. Williams was other than that he was bleeding, and none of the officers thought to ask him about the extent of his injuries at that time.  [Filing No. 77-1, at ECF p. 6; Filing No. 81-3, at ECF p. 6.]  During this conversation, Tyler and Officer Chris Springstun of the IDNR arrived and entered the residence.  [Filing No. 81-3, at ECF p. 6.]

### 3.    *Tyler Speaks with Mr. Williams*

When Tyler arrived in the residence, Officer Chadd told him to keep his voice down because "[Mr. Williams] doesn't know we're here."  [Filing No. 101-17, at ECF p. 9.]  Tyler told the officers he wanted to speak with his father, and Officer Chadd responded, "Go talk to him."  [Filing No. 101-17, at ECF p. 9.]  Tyler initiated a conversation with his father through the bathroom door, which Tyler did not attempt to open.  [Filing No. 101-17, at ECF p. 9-10.]  The officers were approximately five to eight feet from the bedroom door, and could hear everything that both Tyler and Mr. Williams said, [Filing No. 101-17, at ECF p. 10], but Mr. Williams had no reason to know that the officers could hear the conversation, [Filing No. 86-11, at ECF p. 94].

Tyler began by asking "what's going on" and "why don't you come out," but Mr. Williams refused.  [Filing No. 101-17, at ECF p. 10.]  At the urging of Officer Chadd, Tyler asked his father what he had in the bathroom with him, and his father responded that he had knives and an injecting needle used to marinate turkeys.  [Filing No. 101-17, at ECF p. 10.]  Mr. Williams also told his son that he had taken the rest of his bottle of Xanax, which Tyler thought was somewhere between twenty and forty pills.  [Filing No. 101-17, at ECF p. 10.]  Mr. Williams further said that he would "kill anyone that comes through th[e] door."  [Filing No. 101-17, at ECF p. 10.]  Mr. Williams acknowledged to his son that he had cut himself and was

bleeding, and commented that "[t]his is taking longer than I planned." [Filing No. 101-17, at ECF p. 10.] Mr. Williams continued: "This isn't going as fast as the Internet said. Give me 30 more minutes and I'll be done." [Filing No. 101-17, at ECF p. 13-14.] He asked Tyler to go get him his firearm and to bring him "one bullet." [Filing No. 101-17, at ECF p. 10.]

Whispering, Tyler asked the officers what he should do, and Officer Chadd told Tyler to tell Mr. Williams that he has his gun to "[s]ee if he'll come out." [Filing No. 101-17, at ECF p. 10-11.] Tyler described the subsequent events as follows:

> So I came up to [my dad] and said, "Got your gun, come out and get it." My dad said, "No. Put it underneath the door." I told him it would not fit. He said, "I don't believe you." I then took my foot and kicked the door, as if I was trying to shove a gun underneath the door. I was like, "It won't fit," and I was kicking the door. He says, "Where is it?" I said, "Right here." He said, "Put it on the ground, let me see it." I think I actually, at this time, the officers . . . had started to move into the bedroom . . . . And the one officer a couple feet back from the door put his gun down to show that . . . maybe my dad would see the gun and that there was a gun there. . . . [My dad] said he could not see it. I said, "Well, it's right there." The officer did not feel comfortable putting it closer to the door, so he took it back towards his possession.

[Filing No. 101-17, at ECF p. 11.][7] Tyler crouched to the floor, attempting to see where his father was located within the room or what he was doing, and Tyler could only see that his father was standing near the sink.[8] [Filing No. 101-17, at ECF p. 11.] According to Tyler, "It was clear from the communications with my father that he believed I was the only person in the house." [Filing No. 101-18, at ECF p. 5.]

---

[7] Officer Labhart testified that he was the one who placed the firearm on the ground, that he unloaded the firearm before placing it on the ground, and that he reloaded the firearm after he picked it up. [Filing No. 86-11, at ECF p. 93.]

[8] Officer Chadd stated that he also crouched on the floor in an attempt to look under the door, but Tyler attests that he was the only one who did so. [Filing No. 101-18, at ECF p. 6.]

The officers and Tyler exited the bedroom to discuss what action should be taken. [Filing No. 101-18, at ECF p. 6.] The officers discussed the fact that Mr. Williams had cut himself, was bleeding, and had taken all of his Xanax. [Filing No. 86-11, at ECF p. 94-95.] They also knew that they could pop the bathroom door lock from the outside and that Officers Hallam and Chadd both had tasers to subdue Mr. Williams when the door opened. [Filing No. 86-11, at ECF p. 95.] Officer Chadd believed that rushing Mr. Williams was not an option because the officers "were in a confined area" such that "only one officer could enter the bathroom at the same time." [Filing No. 77-1, at ECF p. 7.] The officers eventually told Tyler "that they were going to pop the door open and tase [his dad]."[9] [Filing No. 101-18, at ECF p. 6.][10]

### 4. The Officers Open the Bathroom Door and Deploy Their Tasers at Mr. Williams

The officers reentered the bedroom and positioned themselves throughout the room. [Filing No. 77-1, at ECF p. 7.] Although the precise location of each officer is unclear, [*see, e.g.*, Filing No. 101-10, at ECF p. 26-27; Filing No. 101-14, at ECF p. 9-10], Officers Chadd and Hallam positioned themselves near the bathroom door and had their tasers drawn and aimed at the door. [Filing No. 101-18, at ECF p. 7; *see also* Filing No. 77-1, at ECF p. 7.] Officers Labhart and Springstun had their firearms drawn and aimed at the door. [Filing No. 101-18, at ECF p. 7.] Tyler was also in the room, and the officers indicated that Tyler should continue

---

[9] Plaintiffs contend that it is disputed whether there was a plan in place "to subdue [Mr.] Williams and get him to the ambulance." [Filing No. 100, at ECF p. 20.] Although several of the officers and Tyler remember the exact events differently, it is undisputed that, after the officers discussed Mr. Williams' condition, they made a plan to pop open the bathroom door and tase Mr. Williams. [Filing No. 101-18, at ECF p. 6.]

[10] Defendants' evidence suggests that the plan was to only tase Mr. Williams if he was uncooperative, [*see, e.g.*, Filing No. 77-1, at ECF p. 6], but Plaintiffs' evidence shows that the plan was merely to pop open the bathroom door and immediately tase Mr. Williams, [Filing No. 101-18, at ECF p. 6].

talking to his father in a loud voice.  [Filing No. 101-17, at ECF p. 15.]  Either Officer Thomas or Officer Chadd[11] used the Q-Tip provided to the officers by Ms. Setty to unlock the bathroom door from the outside.  [Filing No. 77-1, at ECF p. 7; Filing No. 101-18, at ECF p. 7.]  After the officer unlocked the door, that same officer flung the door open.[12]  [Filing No. 101-18, at ECF p. 7.]  Through the open doorway, the officers saw Mr. Williams standing at the sink, yet slightly turned and facing the now open doorway, [Filing No. 77-1, at ECF p. 7; Filing No. 101-17, at ECF p. 16], with both hands placed on the sides of the sink, [Filing No. 101-18, at ECF p. 7].  There were two large knives on top of the sink, each approximately a foot long.  [Filing No. 77-1, at ECF p. 7; Filing No. 77-1, at ECF p. 9.]  Mr. Williams was "visibly startled" when the door opened.  [Filing No. 101-18, at ECF p. 7.]  He turned his torso toward the door, and Officers Chadd and Hallam almost simultaneously fired their tasers at Mr. Williams.[13]  [Filing No. 101-18, at ECF p. 7-8.]  At least one of the taser's probes struck Mr. Williams, but neither taser had any apparent effect on him.  [Filing No. 77-1, at ECF p. 7; Filing No. 101-17, at ECF p. 17 (stating that Mr. Williams exhibited "no obvious reaction to the Tasers.  If they were shocking him, it didn't seem to be noticed by him").]

---

[11] Defendants' evidence is that Officer Thomas used the Q-tip to open the bathroom door, [Filing No. 77-1, at ECF p. 7], while Tyler was not certain which officer it was, but "believe[d] it was Officer Chadd," [Filing No. 101-17, at ECF p. 16].  It is immaterial to the Court's ultimate conclusion which officer unlocked the door.

[12] At least some of the officers stated that it was Mr. Williams who opened the bathroom door. [*See, e.g.*, Filing No. 77-1, at ECF p. 7; Filing No. 101-12, at ECF p. 18.]  Tyler, however, stated that an officer opened the door and that it was "impossible" for his father to have opened the door from the position he was standing.  [Filing No. 101-18, at ECF p. 7.]

[13] Although immaterial to the Court's ultimate decision, it is not clear who first discharged their taser.  Some evidence suggests that the tasers were fired simultaneously, [Filing No. 101-18, at ECF p. 7], while other evidence suggests that Officer Hallam fired his taser first, [Filing No. 77-1, at ECF p. 7].  Because Plaintiffs' version of events is that the tasers were fired simultaneously, the Court will accept that version.

5. *Mr. Williams Advances on Officer Hallam with at Least One Knife Raised, Leading to the Use of Deadly Force Against Him*

After the tasers were fired, Mr. Williams grabbed at least one knife off the sink. [Filing No. 101-17, at ECF p. 17; Filing No. 101-18, at ECF p. 8.] He exited the bathroom "slowly" in a "disoriented manner"[14] with the knife raised above his head. [Filing No. 101-18, at ECF p. 8; *see* Filing No. 101-17, at ECF p. 17.] No words were exchanged except that at least one of the officers yelled "run" while everyone backed away from Mr. Williams. [Filing No. 101-17 at ECF p. 17.] Officer Chadd backed up while motioning Tyler to exit the bedroom. [Filing No. 101-17, at ECF p. 17-18.]

Upon exiting the bathroom with the knife raised, Mr. Williams immediately turned to the right toward where Officer Hallam was standing and walked toward him. [Filing No. 77-1, at ECF p. 8; Filing No. 101-17, at ECF p. 17 (stating that Mr. Williams "focused in on . . . [Officer] Hallam").] Mr. Williams "locked eyes" with Officer Hallam and continued to walk directly at him with the knife raised.[15] [Filing No. 101-17, at ECF p. 18; *see* Filing No. 77-1, at ECF p. 8.] The other officers had all backed away from Mr. Williams, and Officer Hallam continued to back up with his firearm pointed at Mr. Williams. [Filing No. 101-17, at ECF p. 18.] Officer Hallam rounded the corners of the bed, but Mr. Williams followed him around each corner with the knife still raised. [Filing No. 101-17, at ECF p. 18.] When Mr. Williams rounded the final corner, Officer Hallam shot at Mr. Williams but missed. [Filing No. 77-23, at ECF p. 10.] Mr. Williams continued to approach Officer Hallam, and Officer Hallam fired a second shot, hitting

---

[14] Defendants produced evidence that Mr. Williams "charged" out of the bathroom, [Filing No. 77-1, at ECF p. 7], but Plaintiffs' evidence disputes this fact, [Filing No. 101-18, at ECF p. 8].

[15] Mr. Williams may have originally grabbed both knives, but dropped one of them as he approached Officer Hallam; either way, it is undisputed that he had both arms raised above his head and in at least one of his hands was a knife. [Filing No. 101-17, at ECF p. 18.]

Mr. Williams when he was approximately three feet away from Officer Hallam. [Filing No. 77-23, at ECF p. 10.] Mr. Williams continued toward Officer Hallam. [Filing No. 77-23, at ECF p. 11.] When Officer Hallam ran out of space to continue backing, he "tripped up" and fell backwards onto the bed, and Mr. Williams fell on top of him. [Filing No. 101-17, at ECF p. 18-20.] As Mr. Williams was falling on top of Officer Hallam, Officer Hallam attempted to fire a third round, but because his firearm was pressed against Mr. Williams, his firearm jammed. [Filing No. 77-23, at ECF p. 11.] When Mr. Williams and Officer Hallam came together, Mr. Williams' knife cut one of Officer Hallam's fingers.[16] [Filing No. 77-23, at ECF p. 19.] There was a brief second of separation between Mr. Williams and Officer Hallam, during which Officers Labhart and Thomas each shot Mr. Williams twice. [Filing No. 77-27, at ECF p. 11; Filing No. 77-31, at ECF p. 16.] There is no evidence that Officer Chadd or Officer Springstun shot at Mr. Williams.

After the three officers shot Mr. Williams, he collapsed on the bedroom floor. [Filing No. 77-1, at ECF p. 8; Filing No. 77-23, at ECF p. 12.] He ultimately died from the gunshot wounds. [Filing No. 77-36, at ECF p. 2.] An estimated two to four seconds elapsed from when Mr. Williams exited the bathroom to when he was shot. [See, e.g., Filing No. 77-27, at ECF p. 24; Filing No. 77-31, at ECF p. 16.]

6.    *Events Following Mr. Williams' Death*

Both parties present evidence regarding the investigation following Mr. Williams' death, including statements his family members made to law enforcement and what the forensic pathologist's investigation revealed. However, as both parties subsequently recognize in their respective briefs, such after-the-fact evidence is irrelevant to deciding whether the officers used

---

[16] The record is not clear, however, whether any of the officers knew about the injury until after the incident occurred. [See Filing No. 77-23, at ECF p. 19.]

excessive force against Mr. Williams at the time the force was used.  To the extent that this evidence is relevant to analyzing Plaintiffs' other claims, it is discussed in conjunction with those claims below.

### B.    Plaintiffs' Expert Reports Are Inadmissible

Plaintiffs submit two expert reports from Brian Clouse and Dr. James Ginger in support of their claims.  [Filing No. 101-4; Filing No. 101-5.]  The Court need not detail the contents of these expert reports at length because, as discussed in detail below, they are inadmissible and, in any event, do not advance Plaintiffs' claims.  Nevertheless, in short, the expert reports conclude that the officers failed to follow established police protocols while handling the situation presented by Mr. Williams.  For example, the experts conclude that the Responding Officers (1) failed to properly identify themselves and their purpose, [Filing No. 101-5, at ECF p. 12]; (2) failed to adequately reassure Mr. Williams, [Filing No. 101-5, at ECF  p. 13]; and (3) failed to gather sufficient information about Mr. Williams' condition, [Filing No. 101-4, at ECF p. 11]. Plaintiffs' experts concluded that these failures, and others, contributed to Mr. Williams' death. [*See* Filing No. 101-4, at ECF p. 19-20; Filing No. 101-5, at ECF p. 19-21.]

Defendants object to the reports and argue that the Court cannot consider Plaintiffs' expert reports at all because they are unsworn.  [Filing No. 115, at ECF p. 6.]  It is well settled that unsworn statements, including expert reports, are inadmissible to support or oppose summary judgment.  *See Wittmer v. Peters*, 87 F.3d 916, 917 (7th Cir. 1996) (stating that defendant's expert reports "were unsworn, hence not affidavits, hence not, strictly speaking, admissible to support or oppose summary judgment"); *Vest v. Al-Shami*, 2014 WL 773231, *6 (S.D. Ind. 2014) ("Dr. Payne's report, as originally designated as part of Plaintiff's evidence in response to the motion for summary judgment, was unaccompanied by a sworn statement and

thus inadmissible."); *Wirick v. Consolidated Rail Corp.*, 2010 WL 2670689, *3 (S.D. Ind. 2010)

("The [expert] report is not accompanied by any kind of sworn statement and therefore is not . . .

admissible to support or oppose summary judgment.") (citation and quotation marks omitted).

Plaintiffs implicitly admit this error by arguing that Defendants' objection should be

overruled given that Plaintiffs attached declarations to their surreply from each of their experts

"authenticating the reports that were previously submitted." [Filing No. 124, at ECF p. 4; *see*

Filing No. 124-1; Filing No. 124-2.] As Plaintiffs' surreply suggests, the declarations of

Plaintiffs' two experts merely authenticate the expert reports. [Filing No. 124-1, at ECF p. 1

(attesting that the previously filed expert report is "a true and accurate copy of [the] expert

report"); Filing No. 124-2, at ECF p. 1 (same).][17]

The Court agrees with Defendants that Plaintiffs' expert reports do not constitute

admissible evidence and may not be considered in opposing summary judgment. *See* Fed. R.

Civ. P. 56. First, as Plaintiffs implicitly recognize, their expert reports were not properly

authenticated and thus are inadmissible. *See* Fed. R. Evid. 901(a); *Scott v. Edinburg*, 346 F.3d

752, 759 (7th Cir. 2003) ("[The expert] report was introduced into the record without any

---

[17] Defendants Officer Chadd and Sheriff Fenwick move to strike Plaintiffs' surreply. [Filing No. 125.] They argue that Plaintiffs' surreply exceeds the scope of a proper surreply under the Local Rules. [Filing No. 126.] Plaintiffs respond that the Court gave Plaintiffs authorization to file a surreply that exceeds the scope of a surreply contemplated by the Local Rules. [Filing No. 127, at ECF p. 1.] The Court indeed granted Plaintiffs leave to file such a surreply. [Filing No. 123, at ECF p. 1.] But Plaintiffs were only given authority to "respond" to Defendants' objections regarding the admissibility of Plaintiffs' expert reports, [Filing No. 122, at ECF p. 1], and to address "new arguments" Defendants first raised in their reply briefs, [Filing No. 122, at ECF p. 2]. Much of Plaintiffs' surreply consists of having the last word on arguments that were at play in the initial briefs, rather than responding to genuinely new arguments raised for the first time in Defendants' reply briefs. The Court should not consider such arguments, but, in any event, concludes that they would not affect the Court's ultimate decision. Setting aside these impermissible arguments, however, Plaintiffs were authorized by the Court to file a surreply brief, and therefore the Court **DENIES** Officer Chadd and Sheriff Fenwick's Motion to Strike. [Filing No. 125.]

supporting affidavit verifying its authenticity and is therefore inadmissible and cannot be considered for purposes of summary judgment.").  Plaintiffs' attempt to cure this defect in their surreply by introducing new evidence is improper.  The Local Rules require the party opposing summary judgment to file "a response brief and *any evidence* . . . that the party relies on to oppose the motion."  Local Rule 56-1(b) (emphasis added).  *See also U.S. ex rel. Abner v. Jewish Hosp. Health Care Servs.*, 2010 WL 811288, *1 (S.D. Ind. 2010) ("Pursuant to Federal Rule of Civil Procedure 56(e), the party opposing a motion for summary judgment must, by affidavit or other evidence, set out specific facts showing a genuine issue for trial.  The party is not entitled to hold back evidence until the filing of a surreply.")  Plaintiffs were permitted to file a surreply brief under the Local Rules given that Defendants "object[ed] to the admissibility of the evidence cited in the response," Local Rule 56-1(d), but that does not permit Plaintiffs to file additional evidence, as the Local Rules are clear that all of Plaintiffs' evidence should have been filed with the response brief, *see* Local Rule 56-1(b).  And even though the Court explicitly granted Plaintiffs leave to file a surreply brief, Plaintiffs only requested such leave to "respond to [Defendant's evidentiary] objection, pursuant to Local Rule 56-1(d)."  [Filing No. 122, at ECF p. 1.]  Therefore, the scope of Plaintiffs' request and the Court's permission to file a surreply did not authorize the filing of additional *evidence*, only a responsive argument.  The additional evidence attached to Plaintiffs' surreply thus cannot be considered.  For this reason alone, Plaintiffs' expert reports remain unauthenticated and inadmissible.

The Court recognizes that a "belated affidavit is sufficient to support the use of [an expert] report at the summary judgment stage."  *Harpold v. Ethicon Endo-Surgery, Inc.*, 2009 WL 688984, *1 (S.D. Ind. 2009).  But even if the Court were inclined to consider Plaintiffs' belated and improperly submitted declarations, Plaintiffs' belated authentication of their expert

reports did not cure the problem Defendants identified—namely, that the expert reports were unsworn. [Filing No. 115, at ECF p. 6.] The declarations by Plaintiffs' experts stating that their previously filed expert reports were "true and accurate copies" of their reports, [Filing No. 124-1, at ECF p. 1; Filing No. 124-2, at ECF p. 1], merely serves to authenticate the reports, and is not the same as swearing under the penalty of perjury that the statements made in the reports are true and correct. *See Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 482 F.Supp.2d 1045, 1057 (N.D. Ind. 2007) (holding that an unsworn expert report cannot be relied upon at summary judgment; "*where the substance of a report is not sworn* by the alleged expert, 'the purported expert's report is not competent to be considered on a motion for summary judgment'") (emphasis added) (quoting *Fowle v. C & C Cola, a Div. of ITT-Continental Baking*, 868 F.2d 59, 67 (3d Cir. 1989)). Because Plaintiffs' expert reports remain unsworn, they do not constitute admissible evidence that the Court may consider on summary judgment. Fed. R. Civ. P. 56(c)(4); *see Wittmer*, 87 F.3d at 917.

It would be an understatement to say that the inadmissibility of Plaintiffs' expert reports is problematic for their opposition to Defendants' motions for summary judgment, given that Plaintiffs rely almost exclusively on their expert reports to support their theory of liability. Unfortunately for Plaintiffs, this was a problem of their own making. Nevertheless, in the end, the Court concludes that even if the expert reports were admissible, Defendants would still be entitled to summary judgment on all Plaintiffs' claims. As a failsafe, the Court discusses Plaintiffs' expert reports below when analyzing Plaintiffs' claims.

### III.
### DISCUSSION

Plaintiffs brought the instant suit following Mr. Williams' death, asserting two federal claims and two state-law claims against various Defendants. Plaintiffs first bring a claim

pursuant to 42 U.S.C. § 1983 against the five defendant officers sued in their individual capacities—Officer Hallam, Officer Chadd, Officer Thomas, Officer Labhart, and Officer Springstun (collectively, the "Responding Officers")—alleging that they used excessive force against Mr. Williams in violation of his Fourth Amendment rights. [Filing No. 45, at ECF p. 8.] Second, against Putnam County Sheriff Steve Fenwick in his official capacity ("Sheriff Fenwick")[18] and Cloverdale, Plaintiffs assert a § 1983 municipality liability claim, arguing that each failed to adequately train their officers in handling suicidal and emotionally disturbed individuals, which caused Mr. Williams' death. [Filing No. 45, at ECF p. 9.] Plaintiffs also assert state-law claims of wrongful death and, solely on behalf of Mr. Williams' son Tyler,[19] negligent infliction of emotional distress against Sheriff Fenwick, Cloverdale, the ISP, and the IDNR. [Filing No. 45, at ECF p. 10-11.] Defendants move for summary judgment on all of Plaintiffs' claims. [Filing No. 75; Filing No. 80; Filing No. 82; Filing No. 84.][20] The Court addresses each of Plaintiffs' claims in turn.

---

[18] As Plaintiffs acknowledge, their claim against Sheriff Fenwick in his official capacity is treated as a claim against Putnam County itself. *See Franklin v. Zaruba*, 150 F.3d 682, 684 n.2 (7th Cir. 1998).

[19] Although Plaintiffs' Amended Complaint alleged this claim on behalf of Tyler and Jacob, [Filing No. 45], they affirmatively abandon Jacob's claim and pursue it only for Tyler, [Filing No. 100, at ECF p. 64 n.14].

[20] As stated above, Defendants filed four separate motions for summary judgment in the following groups: (1) Officer Chadd and Sheriff Fenwick, [Filing No. 75]; (2) Cloverdale, [Filing No. 80]; (3) ISP, IDNR, Officer Labhart, Officer Springstun, and Officer Thomas, [Filing No. 82]; and (4) Officer Hallam, [Filing No. 84]. Because Defendants adopt several of each other's arguments, and because Plaintiffs responded to the motions collectively, the Court addresses the motions and arguments collectively. Where Defendants' arguments overlap or are substantially the same—as most of them are—the Court focuses on and often cites to only one of the Defendants' briefs, and refers to the argument generally as "Defendants."

**A.      § 1983 Excessive Force Claims**

The Responding Officers each move for summary judgment on Plaintiffs' excessive force claim on two grounds: (1) their conduct did not violate the Fourth Amendment; and (2) they are entitled to qualified immunity.  [Filing No. 76, at ECF p. 18-23; Filing No. 83, at ECF p. 9-14; Filing No. 85, at ECF p. 7-14.]  Plaintiffs contend that summary judgment is not proper on either ground.  [Filing No. 100, at ECF p. 35-58.]   The Court begins by setting forth the basic principles governing excessive force claims and qualified immunity before turning to the parties' specific arguments and the analysis thereof.

*1.      Principles of § 1983 Excessive Force Claims and Qualified Immunity*

<u>a.      § 1983</u>

A cause of action may be brought under 42 U.S.C. § 1983 against "[e]very person who, under color of statute, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." To survive summary judgment, a plaintiff claiming a violation of § 1983 must produce evidence that the defendant "caused or participated in [the] constitutional deprivation." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011).   A plaintiff may not rely on the doctrine of respondeat superior, but must instead allege personal involvement in the wrongdoing; "[t]here must be a causal connection or affirmative link between the action complained about and the official sued." *Arnett v. Webster*, 658 F.3d 742, 759 (7th Cir. 2011).

<u>b.      Excessive Force</u>

A claim that an officer used excessive force in seizing an individual is "analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S.

386, 388 (1989); *accord Plumhoff v. Rickard*, --- S.Ct. ----, 2014 WL 2178335, *7 (2014). "[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Graham*, 490 U.S. at 396 (citations and internal quotation marks omitted); *accord Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 724 (7th Cir. 2013). Factors relevant to the inquiry include "'[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009) (alterations in original) (quoting *Graham*, 490 U.S. at 396); *accord Phillips v. Community Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012). "The dispositive question is whether, in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight), the officer behaved in an objectively reasonable manner." *Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011) (citation and internal quotation marks omitted); *accord Plumhoff*, 2014 WL 2178335, at *7. This requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Phillips*, 678 F.3d at 519 (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted).

An officer's use of force is "judg[ed] from the totality of the circumstances at the time of the [seizure]." *Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013) (alterations in original) (citation and internal quotation marks omitted). In analyzing whether an officer's force was reasonable under the circumstances, the Court must "remain cognizant of 'the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Abbott*, 705 F.3d at 724 (quoting *Graham*, 490 U.S. at 397). The Court must

therefore give "considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations." *Baird*, 576 F.3d at 342. "'[W]hen material facts (or enough of them to justify the conduct objectively) are undisputed, then there would be nothing for a jury to do except second-guess the officers,'" therefore, "[i]n this situation . . . the reasonableness of the force used is a legal question." *Cyrus v. Town Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (quoting *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003)).

"Plaintiffs need not show physical injury in order to sustain an excessive force claim," as "an arrest can be effectuated by the slightest application of physical force, or by some other show of authority." *Baird*, 576 F.3d at 344 (citing *California v. Hodari D.*, 499 U.S. 621, 625 (1991)). "The issue is simply whether, once it is clear . . . that a seizure has occurred, that seizure meets Fourth Amendment standards." *Id.*

<u>c.</u>    Qualified Immunity

"[Q]ualified immunity is *immunity from suit* rather than a mere defense to liability." *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 988 (7th Cir. 2012) (emphasis in original) (citation and quotation marks omitted). It gives "government officials 'the benefit of legal doubts.'" *Rooni v. Biser*, 742 F.3d 737, 743 (7th Cir. 2014) (quoting *Elliott v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991)); *see Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) ("Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties."). In the excessive-force context, qualified immunity, "in effect, affords enhanced deference to officers' on-scene judgments about the level of necessary force." *Abbott*, 705 F.3d at 725. "Once the defense of qualified immunity is raised, 'it becomes the plaintiff's burden to defeat it.'" *Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012) (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)).

"To determine whether a defendant is entitled to qualified immunity, courts must address two issues: (1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was clearly established at the time of the violation." *Rooni*, 742 F.3d at 742 (citation omitted). "In other words, the plaintiff must show not only that her constitutional rights were violated, but that any reasonable official under the circumstances would have realized that her rights were being violated." *Easterling v. Pollard*, 528 Fed. Appx. 653, 656-57 (7th Cir. 2013). The Court may decide these factors in either order. *See Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012).

"To be clearly established at the time of the challenged conduct, the right's contours must be 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right,' and 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013) (quoting *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012)). The plaintiff can carry his burden to identify the clearly established right "either by identifying a 'closely analogous case that established a right to be free from the type of force the police officers used on him' or by showing 'that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment.'" *Findlay*, 722 F.3d at 899 (quoting *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008)); *accord Abbott*, 705 F.3d at 723-24. That being said, "a case directly on point is not required for a right to be clearly established and 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Abbott*, 705 F.3d at 731 (quoting *Phillips*, 678 F.3d at 528). In identifying the clearly established right, the plaintiff must do so "in a particularized sense, rather than in an abstract or general sense." *Id.* The Supreme Court has "repeatedly told courts . . . not

to define the clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 2014 WL 2178335, at *9 (citations and quotation marks omitted).

### 2.    *Plaintiffs' Excessive Force Claims*

Plaintiffs' theory of liability for excessive force focuses first on the Responding Officers' alleged failures to follow established law enforcement protocols for dealing with suicidal individuals and their alleged failure to make an adequate plan for handling Mr. Williams' situation (*i.e.*, Plaintiffs' "deficient plan theory").   [*See* Filing No. 100, at ECF p. 41-46.] According to Plaintiffs, the Responding Officers' pre-seizure conduct is not only relevant in assessing the reasonableness of the Responding Officers' subsequent uses of force, but also was itself unreasonable.  [*See* Filing No. 100, at ECF p. 41-46.]  Plaintiffs additionally focus on the three instances when they contend that Mr. Williams was seized and thus the Responding Officers' use of force must be considered: "(1) when the police opened the door to the bathroom with weapons trained on him; (2) when [Officer] Chadd and [Officer] Hallam tased him; and (3) when [Officers] Hallam, Labhart, and Thomas used deadly force."   [Filing No. 100, at ECF p. 36.]

In evaluating the constitutionality of this conduct, the Court must "carve up the incident into segments and judge each on its own terms to see if the officer[s] w[ere] reasonable at each stage." *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999) (citation and quotation marks omitted).  Therefore, the Court must determine first whether "a seizure occurred," and if it did, whether "that seizure meets Fourth Amendment standards," *Baird*, 576 F.3d at 344, and whether the seizure violates clearly established law, *Miller*, 698 F.3d at 962.  The Court turns first to the

relevance of the Responding Officers' pre-seizure conduct and whether such conduct can violate Mr. Williams' Fourth Amendment rights, before addressing each alleged seizure in turn.

a.      Pre-seizure conduct: Plaintiffs' deficient plan theory.

The parties vigorously dispute whether and to what degree the Responding Officers' pre-seizure conduct is relevant. Generally stated, Plaintiffs' theory of liability is that the Responding Officers' pre-seizure conduct and overall plan to deal with the situation was unreasonable, and thus they are liable for the foreseeable consequences of that deficient plan. [*See* Filing No. 100, at ECF p. 40 (citing *Deering*, 183 F.3d at 652; *Estate of Starks v. Enyart*, 5 F.3d 230, 233-34 (7th Cir. 1993)).] This theory of liability is relevant in assessing both factors of the qualified immunity inquiry: "(1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was clearly established at the time of the violation." *Rooni*, 742 F.3d at 742 (citation omitted). The Court addresses each factor in turn.

> **i.    Evidence of the Responding Officers' alleged deficient plan, while perhaps relevant, cannot itself constitute a Fourth Amendment violation.**

Plaintiffs rely solely on the reports of their two law-enforcement experts, Dr. Ginger and Mr. Clouse, to argue that the Responding Officers "violated almost every principle for dealing with suicidal or emotionally disturbed persons." [Filing No. 100, at ECF p. 40.] For example, Plaintiffs' experts state that the Responding Officers should have made "contact with the subject, being clear about their status and purpose" and "[i]dentif[ied] the 'real problem.'" [Filing No. 100, at ECF p. 42 (citing Filing No. 101-5, at ECF p. 11).] Instead of following these protocols, say Plaintiffs, the Responding Officers "deceived [Mr.] Williams, then surprised him by opening the door with weapons drawn and attacked him. [They] had no reason to use force when they

did, and they made no reasonable effort to end the encounter peacefully. [Mr.] Williams'[] response, and the tragedy that followed, was foreseeable." [Filing No. 100, at ECF p. 40.]

Defendants contend that the Responding Officers' pre-seizure conduct is irrelevant to the Fourth Amendment inquiry. [Filing No. 76, at ECF p. 19.] Indeed, Defendants point to several Seventh Circuit cases supporting their position and attempt to distinguish the two cases on which Plaintiffs rely. [*See* Filing No. 115, at ECF p. 8-10; Filing No. 116, at ECF p. 14-15.]

The Seventh Circuit addressed the relevance of pre-seizure conduct in *Carter v. Buscher*, where it held that the Fourth Amendment does not "prohibit[] [law enforcement from] creating unreasonably dangerous circumstances in which to effect a legal arrest of a suspect." 973 F.2d 1328, 1332 (7th Cir. 1992). This is so, the Seventh Circuit reasoned, because "[t]he Fourth Amendment prohibits unreasonable *seizures* not unreasonable, unjustified or outrageous conduct in general. Therefore, pre-seizure conduct is not subject to Fourth Amendment scrutiny." *Id.* (emphasis in original). Accordingly, the Seventh Circuit characterized the analysis that must be undertaken in an excessive force case quite simply: "identify[] the seizure," and "[t]hen . . . proceed[] to examine . . . whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances." *Id.* The Seventh Circuit continued, "Even if the defendants concocted a dubious scheme to bring about [the plaintiff's seizure], it is the [seizure] itself and not the scheme that must be scrutinized for reasonableness under the Fourth Amendment." *Id.* at 1333; *see also* Tom v. Voida, 963 F.2d 952, 956 (7th Cir. 1992) ("Even if [the officer's] various decisions to question and follow [the plaintiff] were unjustified, they did not constitute a 'seizure' and, as a result, are not subject to any Fourth Amendment scrutiny."); *cf.* Jenkins v. City of Lawrence, 2011 WL 2670830, *6 (S.D. Ind. 2011) ("While argument may exist that [the

officer's] action[s] were not prudent, nor the best course of action or even necessary, these are not the proper considerations [in assessing whether qualified immunity applies to his use of force].").

Despite this seemingly clear authority, Plaintiffs argue that the Seventh Circuit "long ago rejected" Defendants' arguments that pre-seizure conduct is irrelevant in *Deering* and *Starks*. [Filing No. 100, at ECF p. 40-41.]  A careful reading of Seventh Circuit's analysis in each of these cases demonstrates why Plaintiffs' position is off the mark.

*Deering* was an excessive force case involving a post-trial challenge to the evidence the district court admitted regarding conduct that occurred before the seizure.  *See* 183 F.3d at 647. Relying on *Carter*, the defendant officer argued that law enforcement's decision to serve a warrant "in the middle of the night on an elderly man living alone in a rural farmhouse" was irrelevant pre-seizure conduct.  *Id.* at 650.  The Seventh Circuit's sole treatment of this argument was as follows: "Reading *Carter* in the context of other cases, however, we think the most that can be said, for purposes of our case, is that *Carter* reinforces the concept . . . that the deputies did not need to consider all feasible alternatives in serving the warrant on [the plaintiff].  But that is not the same as saying that any specific alternative is per se reasonable." *Id.*  The Court then went on to hold that the pre-seizure conduct was relevant, but only to the extent that it evidenced "what [the officer] knew at the time," as the officer's knowledge at the time he used the force in question was of course "relevant to the evaluation of the reasonableness of his conduct." *Id.* at 652.  But this was only to say that the "totality of the circumstances" that must be considered "cannot be limited to the precise moment when [the officer] discharged his weapon," as actions prior to the application of force reflect his knowledge the moment he decided to use the force, and that therefore such evidence is relevant and admissible. *Id.* at 649; *see id.* at 653 (holding

29

that the jury instruction stating that "the reasons for issuing the warrant for [the plaintiff's] arrest are irrelevant" was given in error because "[t]he reasons for issuing the warrant are part of the facts and circumstances known to [the officer]"). This clarification of what information can be considered as part of the totality of the circumstances certainly is not a rejection of *Carter*, and, as explained further below, is not even truly in tension with *Carter*'s core holding. Indeed, *Deering* merely explains that *Carter*'s seemingly categorical statement—that "pre-seizure conduct is not subject to Fourth Amendment scrutiny," 973 F.2d at 1332—remains true, but that evidence of pre-seizure conduct can still be relevant to the extent it reveals the officers' knowledge at the time they decide to use force.

*Starks* too does not signify a rejection of *Carter*. In *Starks*, three police officers located a reportedly stolen cab in a parking lot, and they exited their vehicles to approach the man inside the cab. *See* 5 F.3d at 232. Instead of complying with the officers' request to exit the vehicle, the man slowly reversed the cab into one of the officers' vehicles and then drove forward a short distance, but his escape was blocked by a utility pole. *See id.* The driver reversed again so as to maneuver into a clear escape route, placed the car in drive, and floored the accelerator. *See id.* After the driver began moving forward "at a high rate of speed," one of the officers "moved out from behind the utility pole, jumping to a position in front of the moving cab. All three officers fired their weapons[,] [and the plaintiff] died as a result of his gunshot wounds." *Id.* The Seventh Circuit affirmed the denial of the officers' motion for summary judgment on the issue of qualified immunity for their use of deadly force. *See id.* at 233-34.

The Seventh Circuit first highlighted the fact that the driver's "attempt to maneuver the cab was not so reckless that, apart from [the officer's] appearance at the front of the cab, police officers could reasonably fear for their safety or the safety of the community," precluding the

officers from considering the driver "a fleeing felon against whom deadly force could legitimately be used." *Id.* at 233. Given this, the court could not conclude that summary judgment on the issue of qualified immunity was appropriate:

> The key dispute for the factfinder will be whether [the officer] stepped in front of [the driver's] rapidly moving cab, leaving [the driver] no time to brake. If he did, then [the officer] would have unreasonably created the encounter that ostensibly permitted the use of deadly force to protect him, because the decedent would have been unable to react in order to avoid presenting a deadly threat to [the officer]. On the other hand, if [the officer] was in the path of the car before the car started forward or if the factfinder concludes that [the driver] could have braked but chose not to, then the three [officers] reasonably responded to [the driver's] acceleration toward [the officer]. [The driver] would have threatened the life of a police officer, and reasonable officers could believe that the use of deadly force was appropriate.

*Id.* at 234.

Like *Deering*, *Starks* does not explicitly or implicitly reject *Carter*, as Plaintiffs contend. The Seventh Circuit in *Starks* found an issue of fact and deemed the officer's pre-seizure conduct relevant only to the extent that the officer's unilateral pre-seizure conduct made it *impossible* for the driver to avoid "presenting a deadly threat" to the officer, which in turn justified the officer's use of deadly force. *Id.*; *see id.* ("[If the driver had] no time to brake . . . then [the] [o]fficer . . . would have unreasonably created the encounter that ostensibly permitted the use of deadly force to protect him, *because the decedent would have been unable to react in order to avoid presenting a deadly threat to [the officer]*.") (emphasis added).

It is true, as Plaintiffs contend, that in balancing the nature of the intrusion against the countervailing government interest at stake, the Seventh Circuit in *Starks* held that there is "no countervailing governmental interest in unreasonable police conduct that would justify a greater intrusion on the individual's rights." *Id.* Plaintiffs read this quote in isolation, as if in order to show a Fourth Amendment violation they only need to point to any law enforcement conduct

that could be deemed "unreasonable" and that increases the justification for using a higher level of force—such as not following established police protocols or following a deficient plan. But Plaintiffs quote this sentence without context. The sentence in *Starks* preceding the quote makes clear that "unreasonable police conduct" is only conduct that increases the justification for the use of force "*solely* based on the actions of a police officer." *Id.* (emphasis in original); *see id.* ("The alleged unreasonableness of [the officer's] action, according to the plaintiffs, comes from moving out from behind the pole *without leaving [the driver] time to stop the car*. For the limited purpose of this appeal, we agree with this assessment.") (emphasis added); *see also Estate of Brown v. Thomas*, --- F.Supp.2d ----, 2014 WL 1053320, *7 (E.D. Wis. 2014) ("*Starks* does not say that officers who use aggressive police tactics cannot use deadly force if it becomes necessary. It merely says that police cannot escape liability if *their actions* turn a nonviolent fleeing suspect into a violent threat to life and limb. That is not what happened here." (emphasis added)). A factual dispute was found on this issue in *Starks* because, according to the plaintiff's version of the facts, it was literally impossible for the plaintiff, given the officer's actions, to avoid placing the officer in imminent risk of serious bodily injury or death. *See* 5 F.3d at 234.

None of the Responding Officers' conduct in this case was "unreasonable" like the officer's conduct in *Starks*. Specifically, the Responding Officers' conduct was not the "sole[]" cause of the increased justification for the use of force; Mr. Williams' responses to the Responding Officers' conduct, at the very least, precipitated the increased justification. In other words, none of the Responding Officers' alleged pre-seizure errors unilaterally justified a greater use of force. Plaintiffs implicitly acknowledge this by arguing that "[Mr.] Williams'[] *response*" to the Responding Officers' allegedly deficient plan "was foreseeable." [Filing No. 100, at ECF p. 40 (emphasis added).] And they must, as it is undisputed that after the Responding Officers

attempted to use non-lethal force to subdue Mr. Williams, he engaged in the threatening conduct of advancing on Officer Hallam with at least one twelve-inch knife raised in the air. [*See, e.g.*, Filing No. 77-1, at ECF p. 8; Filing No. 101-17, at ECF p. 18.] It was this act by Mr. Williams, not "*solely . . .* the actions of a police officer," *Starks*, 5 F.3d at 234 (emphasis in original), that justified a greater use of force against Mr. Williams.

In sum, although *Deering* and *Starks* clarify that pre-seizure events are not literally irrelevant to the Fourth Amendment inquiry, they do not undermine the core holdings of *Carter* that are relevant here—namely, that (1) the Fourth Amendment does not "prohibit[] creating unreasonably dangerous circumstances in which to effect a legal [seizure] of a suspect," 973 F.2d at 1332; and (2) "it is the [seizure] itself and not the scheme [to complete the seizure] that must be scrutinized for reasonableness under the Fourth Amendment," *Id.* at 1333. Notably, the Seventh Circuit has reiterated these core holdings of *Carter* after both *Deering* and *Starks* were decided. *See, e.g.*, *Marion v. City of Corydon, Ind.*, 559 F.3d 700, 705 (7th Cir. 2009) ("Pre-seizure police conduct cannot serve as a basis for liability under the Fourth Amendment; we limit our analysis to force used when a seizure occurs."); *McCoy v. Harrison*, 341 F.3d 600, 605 (7th Cir. 2003) ("Even unreasonable, unjustified, or outrageous conduct by an officer is not prohibited by the Fourth Amendment if it does not involve a seizure.") (alteration and citation omitted); *see also* *Price v. Marion Cnty. Sheriff's Dep't*, 2013 WL 5321260, *6 (S.D. Ind. 2013) ("Because 'pre-seizure conduct is not subject to Fourth Amendment scrutiny,' the court must first determine whether Defendants' conduct constituted a seizure of [the plaintiff].") (quoting *Carter*, 973 F.2d at 1332); *Hayes v. City of Indianapolis*, 2009 WL 700232, *3 (S.D. Ind. 2009) ("'[P]re-seizure conduct is not subject to Fourth Amendment scrutiny.'") (quoting *Carter*, 973 F.2d at 1332); *Escobedo v. City of Fort Wayne*, 2008 WL 1971405, *18 (N.D. Ind. 2008)

("Before undertaking any analysis of the reasonableness of the Defendants' actions, the Court must determine whether, and when, a seizure occurred.  This is important because 'pre-seizure conduct is not subject to Fourth Amendment scrutiny.'") (quoting *Carter*, 973 F.2d at 1332).

Simply put, Plaintiffs' theory is directly analogous to the one advanced and rejected in *Carter*, where the theory of liability was that law enforcement's "plan for [the plaintiff's] arrest provoked a situation whereby unreasonable deadly force was used in the attempt to seize his person," yet the plaintiff reacted to the allegedly deficient plan in a way that justified deadly force.  973 F.2d at 1329-30.  And it is distinguishable from *Starks* where an issue existed as to whether the unilateral action of the officer justified the use of deadly force.  5 F.3d at 233-34.  This distinction is critical and is what forecloses Plaintiffs' deficient plan theory in this case.

Accordingly, the Court rejects Plaintiffs' deficient plan theory of liability as the basis of an excessive force claim.  The Responding Officers' pre-seizure conduct cannot itself violate Mr. Williams' Fourth Amendment rights, and it bears on the Responding Officers' subsequent uses of force against Mr. Williams only to the extent that the pre-seizure conduct reveals the Responding Officers' knowledge at the time the force was used.  As *Carter* makes clear, "[e]ven if the defendants concocted a dubious scheme to bring about [the seizure of Mr. Williams], it is the [seizure] itself and not the scheme that must be scrutinized for reasonableness under the Fourth Amendment."  973 F.2d at 1333.

### ii.    Qualified immunity for the deficient plan claim.

Even if a constitutional violation could be predicated on the Responding Officers' allegedly deficient plan, they are entitled to qualified immunity for such a violation because Plaintiffs fail to point to any clearly established law that such conduct violates the Fourth Amendment.  Indeed, Plaintiffs, citing only *Starks*, discuss qualified immunity regarding this

basis for liability in one sentence: "it was clearly established long before these events that police cannot recklessly escalate a situation and provoke the need to use deadly force." [Filing No. 100, at ECF p. 57 (citing *Starks*, 5 F.3d at 234-35).]

Defendants reply that Plaintiffs failed to point to any clearly established law that law enforcement's failure to formulate an appropriate plan—or failure to do any of the other specific activities Plaintiffs' experts opined should have been done, such as gathering all possible information from Mr. Williams—violated Mr. Williams' Fourth Amendment rights. [Filing No. 115, at ECF p. 18.] According to Plaintiffs, the Responding Officers violated the clearly established law in *Starks* when they "ignored generally accepted principles[21] for dealing with suicidal or emotionally disturbed persons" as set forth by Plaintiffs' two law enforcement experts, [Filing No. 100, at ECF p. 42], practices such as "[m]ak[ing] contact with the subject, being clear about their status and purpose," and "[a]ssum[ing] a reassuring and supportive communication style," [Filing No. 100, at ECF p. 42 (citing Filing No. 101-5, at ECF p. 11)]. Instead of following these established procedures, Plaintiffs contend, the Responding Officers created the "unreasonable" plan "to surprise [Mr.] Williams by opening the bathroom door with weapons drawn and immediately tasing him." [Filing No. 100, at ECF p. 41; *see* Filing No. 100, at ECF p. 55 ("[T]he officers' earlier unreasonable conduct provoked the deadly encounter.").]

As discussed at length above, contrary to Plaintiffs' characterization of *Starks*—that "police cannot recklessly escalate a situation and provoke the need to use deadly force," [Filing No. 100, at ECF p. 57]—that case stands for the much narrower proposition that police cannot take actions that alone "justify a greater [use of force]" than would otherwise be appropriate, *Starks*, 5 F.3d at 234. *See id.* ("If a fleeing felon is converted to a 'threatening' fleeing felon

---

[21] The Court again notes its discussion of Plaintiffs' expert reports is as a failsafe, as the Court has ruled the reports inadmissible in evidence.

*solely* based on the actions of a police officer, the police should not increase the degree of intrusiveness.") (emphasis in original). And, as explained above, that is not what occurred here.

Accordingly, in the alternative, the Responding Officers are entitled to qualified immunity for their noncompliance with allegedly well-established police protocols for dealing with suicidal individuals and for any deficiencies in their plan to subdue Mr. Williams.

b.     Identification of the Separate Seizures

Having concluded that Plaintiffs' excessive force claim cannot be predicated on the Responding Officers' allegedly deficient plan, the Court will assess the remainder of Plaintiffs' excessive force claims as *Carter* prescribes: by "identifying the seizure[s]," and "[t]hen . . . proceeding to examine . . . whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances." 973 F.2d at 1332; *see also Baird*, 576 F.3d at 344. Plaintiffs contend that three seizures occurred, and the Court addresses each potential seizure in turn.

<b>i.     Opening of the Bathroom Door</b>

Plaintiffs contend that Mr. Williams was first seized "when the officers opened the [bathroom] door with Tasers and guns trained on him. This was a seizure by submission to a show of authority through passive acquiescence."[22] [Filing No. 100, at ECF p. 28.] But as Defendants correctly argue, there is no evidence that Mr. Williams acquiesced to the Responding Officers' show of authority when they opened the door. [Filing No. 115, at ECF p. 11.] And if Mr. Williams did not submit to the show of authority, "there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin v. California*, 551 U.S. 249, 254 (2007);

---

[22] Plaintiffs argue as if the show of authority creating the seizure was contributed to by all of the Responding Officers; therefore, the Court will not parse this alleged seizure officer-by-officer, especially given that the Court concludes that no seizure occurred.

*id.* ("A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission."); *accord Hodari D.*, 499 U.S. at 626-27; *Abbott*, 705 F.3d at 719. By Plaintiffs' own account of the events, the tasers were deployed almost immediately after the bathroom door opened. [Filing No. 101-18, at ECF p. 7-8; *see also* Filing No. 100, at ECF p. 46 (arguing that it was "unreasonable for the officers . . . to surprise [Mr.] Williams by opening the bathroom door with Tasers and handguns pointed at him, then *immediately tasing him without warning*") (emphasis added).] Mr. Williams could therefore have not actually submitted to the show of authority occasioned only by opening the door.

But even if the fact that Mr. Williams was never given time to submit to the show of authority renders him seized, Defendants contend that the force used—pointing tasers and guns at him—was not unreasonable. [Filing No. 115, at ECF p. 11.] Tellingly, Plaintiffs do not marshal an argument to the contrary. [*See* Filing No. 100, at ECF p. 40-52.]

The Seventh Circuit has made clear that law enforcement may point their firearms at individuals "when there is a reasonable threat of danger or violence to the police." *Baird*, 576 F.3d at 346; *see United States v. Howard*, 729 F.3d 655, 660 (7th Cir. 2013) (holding that it was reasonable under the Fourth Amendment for a police officer to order an individual to the ground at gunpoint because the facts demonstrated that "the concern for officer safety was specific and strong," and noting that cases holding otherwise involve situations where the officers had no reason to believe the individual was "dangerous"). As discussed in even greater detail below, the Responding Officers all had reason to fear for their safety once the bathroom door was opened: they knew that Mr. Williams had knives and had committed the crime of felony intimidation by

threatening to kill family members, Officer Hallam, or anyone else who opened the door.[23]

[Filing No. 77-1, at ECF p. 3-5; Filing No. 86-9, at ECF p. 59; Filing No. 101-17, at ECF p. 10.]

Accordingly, even if Mr. Williams was seized by the Responding Officers' show of force, their use of force was reasonable and thus did not violate Mr. Williams' Fourth Amendment rights.[24]

### ii.     Tasing Mr. Williams

Plaintiffs next contend that Mr. Williams was seized when Officers Chadd and Hallam shot him with their tasers.[25]   [Filing No. 100, at ECF p. 38-40.]

As an initial matter, the Court clarifies which actors could face liability for tasing Mr. Williams.   Plaintiffs argue, pursuant to *Starks* and their deficient plan theory of liability discussed above, that all of the Responding Officers are liable for all of the harm done to Mr. Williams.   [Filing No. 100, at ECF p. 52-55; *see also* Filing No. 100, at ECF p. 55 ("All of the officers' earlier unreasonable conduct provoked the deadly encounter, so all of the officers are

---

[23] The undisputed facts reveal that the Responding Officers had probable cause to arrest Mr. Williams for felony intimidation given that he threatened to kill members of his family and Officer Hallam. *See* Ind. Code § 35-45-2-1(a), (b)(1)(A).

[24] Even if the show of authority was unreasonable, the Responding Officers would be entitled to qualified immunity given that the Plaintiffs did not even attempt to carry their burden of citing to clearly established law showing that this particular show of force was unreasonable. *See Escobedo*, 702 F.3d at 404.

[25] Defendants point out to the Court that there is no evidence that the tasers had any effect on Mr. Williams. [Filing No. 76, at ECF p. 19 ("[The] deployment [of the tasers] had no apparent effect on [Mr.] Williams."); Filing No. 116, at ECF p. 12 (arguing that because "the tasers did not work," "there can be no Fourth Amendment excessive force claim").]   But other than merely saying it is so, Defendants do not explain why the fact that the tasers had no apparent effect on Mr. Williams precludes an excessive force claim.   The Court need not discuss at length this argument, given that Defendants themselves deemed it unworthy of development.   It is enough for the Court to merely note that Seventh Circuit law does not require proof of an injury to maintain an excessive force claim.   *See Baird*, 576 F.3d at 346 (holding that "[r]igid insistence on physical injury" to sustain an excessive force claim would not be consistent with Supreme Court precedent); *Lanigan v. Vill. of East Hazel Crest, Ill.*, 110 F.3d 467, 470 n.3 (7th Cir. 1997) ("The district court correctly noted that an excessive force claim does not require an injury.").

liable for Mr. Williams'[] death.").] The Court already rejected this theory of liability above and need not repeat that analysis here. Indeed the Court finds that Defendants are correct, [Filing No. 116, at ECF p. 12], that only the Responding Officers who fired the tasers—that is, "personally caused or participated in the alleged constitutional deprivation"—could be responsible for the harm flowing from that use of force. *Harper v. Albert*, 400 F.3d 1052, 1062 (7th Cir. 2005); *see id.* (holding that each defendant had not participated in the alleged excessive force under the Eighth Amendment, as the plaintiffs "failed to even establish that each and every one of the defendants ever touched the plaintiffs, much less that any of the guards used excessive force against them.") (citations and quotation marks omitted). Accordingly, because they did not use tasers against Mr. Williams, Officers Thomas, Labhart, and Springstun are entitled to summary judgment on Plaintiffs § 1983 excessive force claim predicated on the use of tasers against Mr. Williams on this basis.[26]

This leaves for consideration Officers Chadd and Hallam's use of the tasers. The parties vigorously dispute whether Officers Chadd and Hallam used excessive force when they tased Mr. Williams, and, even if they did, whether they are entitled to qualified immunity for the use of the tasers. Defendants contend that (1) the use of the tasers was constitutionally permissible because Mr. Williams was actively resistant, [Filing No. 76, at ECF p. 19-20; Filing No. 83, at ECF p. 11; Filing No. 85, at ECF p. 11-12]; and (2) they are entitled to qualified immunity because it was not clearly established that the use of tasers under these circumstances was

---

[26] Plaintiffs misquote *Starks* when they argue that it "held that officers who were not responsible for the unreasonable conduct that led to the use of deadly force could also be liable for using deadly force." [Filing No. 100, at ECF p. 55 n.12.] The officers in *Starks* were not responsible for the pre-seizure conduct of the other officer; they were potentially liable because a jury could find that they too "applied the use of deadly force to stop an involuntary action by the decedent," *Starks*, 5 F.3d at 235. Such is not the case for Officers Thomas, Labhart, and Springstun here, who did not use tasers on Mr. Williams.

unconstitutional, [Filing No. 76, at ECF p. 22-23; Filing No. 83, at ECF p. 12-14; Filing No. 85, at ECF p. 13-14].

Plaintiffs first contend that Officers Chadd and Hallam's "use of force—surprising [Mr.] Williams by opening the bathroom door with weapons pointed at him, then immediately tasing him without warning—was objectively unreasonable." [Filing No. 100, at ECF p. 46.] In analyzing this claim, the Court finds it most prudent to proceed immediately to the second qualified immunity prong, the question of whether Officers Chadd and Hallam's taser use against Mr. Williams under the circumstances presented violated clearly established law.

Regarding the relevant clearly established law, Plaintiffs maintain that, "[b]efore January 2012, it was clearly established that tasing a non-resisting, suicidal individual was unconstitutional." [Filing No. 100, at ECF p. 56.] In support of this position Plaintiffs cite two district court cases: *Holzman v. City of South Bend*, 2006 WL 2788587 (N.D. Ind. 2006), and *Pantaleo v. Hayes*, 2013 WL 5311450 (N.D. Ill. 2013). [Filing No. 100, at ECF p. 56-57.] According to Plaintiffs, the authority cited in these cases shows that "it was clearly established before January 15, 2012, that is it unreasonable to tase . . . a non-resisting, suicidal subject, even if that person has previously threatened police and others." [Filing No. 100, at ECF p. 57.]

Defendants first reply that Plaintiffs' attempt to point to clearly established law fails because they only cite district court decisions, which "do not clearly establish the law on anything." [Filing No. 115, at ECF p. 15; Filing No. 116, at ECF p. 18.] Defendants are correct. *See Lott v. Pfizer, Inc.*, 492 F.3d 789, 793 (7th Cir. 2007) ("District court decisions . . . do not render the law clearly established."); *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995) (holding that district court decisions "are evidence of the state of law," "but by themselves . . . cannot clearly establish the law because . . . they are not authoritative as precedent"). However,

Plaintiffs attempt to clarify their strategy on surreply, explaining that their reliance on the two district court opinions they cite—*Pantaleo* and *Holzman*—was not that those cases created the clearly established law, but that "the authority cited" therein shows that certain rights were clearly established. [Filing No. 100, at ECF p. 57; *see* Filing No. 124, at ECF p. 11.] Although the Court cautions Plaintiffs that their decision to rely solely on district court cases in this manner was a precarious one, because Plaintiffs cited them, at least in part, as "evidence" of clearly established law, *Anderson*, 72 F.3d at 525, the Court will consider the district court cases and the clearly established law cited therein in assessing Plaintiffs' claim.

To satisfy their burden of pointing to clearly established law in an excessive force case, Plaintiffs "must demonstrate that the right to be free from the particular use of force under the relevant circumstances was 'clearly established.'" *Abbott*, 705 F.3d at 725. The Court in *Pantaleo* identified the clearly established law regarding the permissible uses of tasers by law enforcement. *See* 2013 WL 5311450, at *13-14 (citing *Abbott*, 705 F.3d 727-28). In *Abbott*, the Seventh Circuit recognized that "[c]ourts generally hold that the use of a taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable." 705 F.3d at 727 (collecting cases). More specifically, the Seventh Circuit held that "[p]rior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects." *Id.* at 732 (collecting cases). The use of a taser, "even though it is generally nonlethal, . . . 'is more than a *de minimis* application of force,'" and indeed "falls somewhere in the middle of the nonlethal-force spectrum." *Id.* at 726 (quoting *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009)); *see id.* ("[T]he X26 [Taser] in dart mode [is] 'an intermediate or medium, though not insignificant, quantum of force.'") (quotation marks omitted) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).

Defendants contend that the clearly established law identified in *Holzman* and *Pantaleo*—that law enforcement cannot tase a non-resisting, suicidal individual—simply does not apply to the use of tasers in this case for at least three reasons. [Filing No. 115, at ECF p. 16-18; *see also* Filing No. 116, at ECF p. 18-19.] First, Mr. Williams was actively resisting by threatening to kill anyone who opened the bathroom door, and thus does not fall within clearly established law regarding force used against non-resisting individuals. [Filing No. 115, at ECF p. 16.] Second, the officers believed they needed to act quickly given that Mr. Williams had cut his wrists. [Filing No. 115, at ECF p. 18.] Third, the "space in which [the Responding Officers] were operating was limited. Only one officer at a time could go through the bathroom door to face a person with at least one knife who had threatened to use it. The proximity of the officers to the subject when the door was opened was such that [Mr.] Williams could be on them in seconds if verbal interaction was attempted after the door was opened." [Filing No. 115, at ECF p. 18.]

The critical issue is whether the facts in this case are closely analogous to those in cases where a plaintiff has been determined to be nonresisting or passively resisting.[27] *See Findlay, 722 F.3d at 899* (stating that a plaintiff can show a right was clearly establish by pointing to a "closely analogous case that established a right to be free from the type of force the police officers used on him") (citation and quotation marks omitted). The undisputed facts, taken in the

---

[27] The constantly shifting nature of Plaintiffs' arguments regarding this issue has made addressing them unnecessarily cumbersome. In their response brief, Plaintiffs point the Court to *Holzman* and *Pantaleo* not only as evidence of the clearly established law regarding the use of tasers, but they also set out the facts of those cases to demonstrate that they are "similar" to those here. [Filing No. 100, at ECF p. 56-57.] But in Plaintiffs' surreply, they argue (in a manner that was beyond the scope of the Court's permission to file a surreply) that the factual distinctions Defendants identified between this case and *Holzman* and *Pantaleo* are "irrelevant" because those cases were cited as evidence of the clearly established law. [Filing No. 124, at ECF p. 11.] Despite these conflicting arguments, the Court addresses each on its own terms below.

light most favorable to Plaintiffs, demonstrate that the Responding Officers decided to confront Mr. Williams after they reasonably believed that he: (1) was suicidal; (2) had taken substantial steps toward committing suicide—cutting his wrists and consuming the rest of his bottle of Xanax—and thus needed medical attention; (3) had threatened to kill or stab members of his family, Officer Hallam, and anyone who opened the bathroom door[28]; and (4) after the door was opened, Mr. Williams' hands were on the sink next to two knives, each of which were a foot long.

Given these facts, Plaintiffs' reliance on the qualified-immunity analysis in *Holzman* and *Pantaleo* is unpersuasive. First, as noted above, neither of these cases can create clearly established law applicable to the circumstances here. *See Lott*, 492 F.3d at 793. Second, neither *Holzman* nor *Pantaleo* are sufficiently analogous to this case such that the Court should rely on them as persuasive authority. In both cases, the plaintiffs were deemed nonresisting because, respectively, one was in a "corner in the fetal position" and was explicitly disclaiming to officers that he was resisting, *Pantaleo, 2013 WL 5311450, at *11*, and the other "wasn't confrontational," had no access to weapons, and did not "fight back" when wrestled to the ground by the officers, *Holzman, 2006 WL 2788587, at *4*. The Responding Officers here faced a dramatically different situation than that faced in either of those cases: they believed they needed to restrain Mr. Williams in order to get him immediate medical attention, and in doing so,

---

[28] Both parties cite to statements that Mr. Williams' family members made after the incident regarding the genuineness of Mr. Williams' threats. [*See, e.g.*, Filing No. 101-18, at ECF p. 5.] There is no evidence, however, that their opinions regarding the reliability of Mr. Williams' threats were ever communicated to Officers Chadd and Hallam, or any of the other Responding Officers, and therefore these statements are irrelevant in assessing the use of tasers against Mr. Williams. *See Padula*, 656 F.3d at 602. Indeed it is undisputed that the family called the police in the first instance, and that Jacob left the house and did not return after his initial encounter with his father wherein his father threatened him if he came into the bathroom.

confront him in an enclosed space, knowing he had threatened to kill them and his family members and that he had the means to carry out that threat.

Having concluded that Plaintiffs' two qualified immunity cases are unavailing, the Court addresses more broadly whether Officers Chadd and Hallam violated the clearly established law—that "police officers could not use significant force on nonresisting or passively resisting suspects," *Abbott*, 705 F.3d at 732—identified in those cases. This principle alone does not easily resolve the issue in this case. The Supreme Court has repeatedly cautioned courts "not to define the clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 2014 WL 2178335, at *9 (citations and quotation marks omitted). Often, defining the clearly established law as forbidding the use of significant force against "nonresisting or passively resisting suspects," *Abbott*, 705 F.3d at 732, is sufficiently particularized to apply to the given case, especially when the plaintiff's version of the facts places beyond reasonable dispute the question of whether the plaintiff was resisting law enforcement, *see, e.g.*, *Pantaleo*, 2013 WL 5311450, at *11-13 (holding that, according to Plaintiffs' version of facts, he was nonresistant, as he had "retreated to a corner in the fetal position, saying that he would take the medicine so as not to be tased"). But here, none of the authorities to which Plaintiffs direct the Court clearly establish that Mr. Williams' conduct would be considered similarly nonresistant when tased by Officers Chadd and Hallam. Because of this significant distinction, the Court cannot conclude that the identified "right's contours [are] 'sufficiently clear [such] that every reasonable official would have understood that [using tasers against Mr. Williams] violates that right,'" nor that "'existing precedent . . . place[s] the . . .

constitutional question beyond debate.'" *Rabin*, 725 F.3d at 632 (quoting *Humphries*, 702 F.3d at 1006).

The Responding Officers were faced with a suicidal individual, who they believed had taken significant steps toward committing suicide. [Filing No. 101-17, at ECF p. 10.] Whether they were ultimately right about this, the facts known to the Responding Officers at the time made it reasonable for them to believe that they needed to quickly get Mr. Williams medical attention before the cuts on his wrists or the Xanax took their toll.[29] They therefore decided to

---

[29] Plaintiffs' numerous attempts to undermine the factual basis for the Responding Officers' sense of urgency to act are unavailing. First, Plaintiffs, citing Tyler's affidavit, argue that "Tyler never overheard the officers discuss any exigent circumstances based on a fear that his father might bleed out." [Filing No. 100, at ECF p. 49 (citing Filing No. 101-18, at ECF p. 6-7).] But the cited evidence does not support Plaintiffs' assertion. The paragraphs of Tyler's affidavit to which Plaintiffs cite, at most, reflect that "[t]here was little discussion" about the plan and that the Responding Officers did not attempt to "speak or negotiate" with Mr. Williams while Tyler "was present in the house." [Filing No. 101-18, at ECF p. 6-7.]

Second, Plaintiffs point to testimony from Dr. Kohr—the forensic pathologist who examined Mr. Williams following his death—to establish that Mr. Williams' "wounds were too superficial to cause him to bleed out and die, and that his wounds would coagulate in about five minutes." [Filing No. 100, at ECF p. 49-50 (citing Filing No. 101-11, at ECF p. 6-7).] But this information was unknown to the Responding Officers at the time they tased Mr. Williams and is therefore irrelevant in addressing the Responding Officers' use of force. *See Padula*, 656 F.3d at 602 ("The dispositive question is whether, *in light of the facts and circumstances that confronted the officer (and not 20/20 hindsight)*, the officer behaved in an objectively reasonable manner.") (emphasis added) (citation and internal quotation marks omitted).

Third, Plaintiffs point out that the Responding Officers "knew that Mr. Williams cut himself at least 20 minutes or more before they opened the door," yet Mr. Williams' "speech did not suggest that he was growing confused, nor did he appear to be on the verge of losing consciousness." [Filing No. 100, at ECF p. 50 (citing Filing No. 101-18, at ECF 6-7).] Plaintiffs implicitly suggest that this undermines any urgency to get Mr. Williams assistance. [Filing No. 100, at ECF p. 50.] This argument borders on the nonsensical. When taken to its logical conclusion, Plaintiffs' argument suggests that law enforcement—when dealing with an individual who had cut his wrists and taken the rest of his bottle of Xanax—must wait until the individual is nearing unconsciousness before intervening. No relevant precedent encourages such an approach. *Cf. Bell*, 321 F.3d at 640 ("It is easy in retrospect to say that officers should have waited, or should have used some other maneuver—these propositions cannot be falsified—but *Graham* makes it clear that the fourth amendment does not require second-

open the bathroom door and tase Mr. Williams. But in doing so, they were confronted with a person who had threatened to kill Officer Hallam or anyone who opened the bathroom door, [Filing No. 81-3, at ECF p. 3; Filing No. 86-9, at ECF p. 59; Filing No. 101-17, at ECF p. 10], that had the means to do so (two knives) sitting right next to hands, [Filing No. 101-17, at ECF p. 10], and they were confined in a relatively small space, [Filing No. 77-1, at ECF p. 7]. In short, when Officers Chadd and Hallam tased Mr. Williams, he remained a very real threat to their safety and had made no indications—either then or at any time during the encounter—that he would cooperate with Officer Hallam or anyone else. Indeed, throughout the entire encounter Mr. Williams consistently told almost everyone he spoke to that he would kill them if they opened the door. [Filing No. 77-16, at ECF p. 6; Filing No. 81-3, at ECF p. 3; Filing No. 86-9, at ECF p. 59; Filing No. 101-17, at ECF p. 10.]

Nothing about the cases to which Plaintiffs point, or the cases cited therein, would make it clear to "'every reasonable [officer]'" that tasing Mr. Williams under these circumstances would constitute excessive force. *Rabin*, 725 F.3d at 632 (quoting *Humphries*, 702 F.3d at

---

guessing if a reasonable officer making decisions under uncertainty and the press of time would have perceived a need to act.").

Finally, Plaintiffs argue that, "[i]n light of the fact that suicide attempts are so rarely successful, there was no reason for a reasonable officer to believe that Mr. Williams was in imminent danger." [Filing No. 100, at ECF p. 50.] In support of this assertion, Plaintiffs cite Dr. Kohr's testimony that there is a "two- to fivefold attempt versus successful completion [rate] in many [suicide] situations." [Filing No. 101-11, at ECF p. 13.] Not only is there no evidence that the Responding Officers were aware of this statistic, but even if they were, like Plaintiffs' previous argument, this argument borders on the absurd. Plaintiffs suggest that it was unreasonable for the Responding Officers to believe that Mr. Williams was in need of imminent assistance even though he had cut his wrists and taken the rest of his bottle of Xanax simply because suicide attempts are typically unsuccessful. General statistical evidence regarding the success rate of suicide attempts does not undermine the undisputed evidence that the Responding Officers were motivated by a sense of urgency, with the knowledge that Mr. Williams had taken concrete steps toward committing suicide and thus may have been in need of immediate medical attention.

1006). Or, put more precisely, the cases to which Plaintiffs point would not lead every reasonable officer confronted with the circumstances faced by Officers Chadd and Hallam to conclude that Mr. Williams was nonresisting such that the use of significant force was unconstitutional. In *Abbott*, for example, the plaintiff was nonresisting because she had already been tased once (which she did not challenge), but then was tased again while lying on the ground and not moving or otherwise responding to an officer's commands. *See* 705 F.3d at 732. The cases cited in *Abbott* rely on similar facts that make it clear the individual was not resisting. *See, e.g.*, *Phillips*, 678 F.3d at 524 (holding that the plaintiff was not "actively resisting arrest" because, among other reasons, she "never exhibited any sort of aggressive behavior toward the officers"); *Morfin v. City of E. Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003) (holding that a jury could conclude that officers used excessive force in grabbing the plaintiff and throwing him to the floor when he "did not pose a threat," "was docile and cooperative," and "did not resist arrest in any way"); *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003) (holding that it was excessive force for an officer to apply overly tight handcuffs to "a woman who was not threatening to harm the police officer or anyone else at the scene, was not resisting or evading arrest, was not attempting to flee, and was charged with such minor offenses"). Plaintiffs in these cases stand in stark contrast to Mr. Williams, who had continually threatened to kill a police officer, his family, and himself, and had the means readily available to do so when Officers Chadd and Hallam tased him.

In a final effort to characterize Mr. Williams as nonresisting, Plaintiffs make much of the fact that Officers Chadd and Hallam tased Mr. Williams immediately, before he even attempted to grab the knives that were sitting on the sink next to his hands. [Filing No. 101-18, at ECF p. 7-8.] But Officers Chadd and Hallam "were under no constitutional obligation to carry out the

[seizure] in a way that would have given [Mr. Williams] an opportunity to make good on his earlier threats." *Catlin v. City of Wheaton*, 574 F.3d 361, 366 (7th Cir. 2009); *see also Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007) (holding that *deadly force* was reasonable when, following a struggle during which an officer's "gun got loose, at least two officers believed [the plaintiff] had his hands on *or near it*. Police officers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon and completely freed himself from officers trying to subdue him before taking action to ensure their safety") (emphasis added). Moreover, unlike cases in which the plaintiff was characterized as nonresisting because, although he posed a serious threat, he did not pose an "immediate" one, *Phillips*, 678 F.3d at 525 (citing *Graham*, 490 U.S. at 396), once the bathroom door was open and Mr. Williams stood mere feet away from Officers Chadd and Hallam with knives near his hands, the threat was certainly an immediate one, *see id.* (holding that the plaintiff did not pose an "immediate" threat when the officers used force against her because she "was sprawled across the front seat with her legs outside of the car and both feet on the ground. Even to move into a position to drive the car [and endanger the officer], [the plaintiff] would have had to, at a minimum, sit up, bring her feet in, close the car door, and press the gas pedal").

In sum, Mr. Williams was not "nonresisting" as that term has been applied to other § 1983 plaintiffs such that it was clearly established that Officers Chadd and Hallam's use of tasers against him constituted excessive force. Plaintiffs have not carried their burden to identify a "closely analogous case that established a right to be free from the type of force the police officers used on [Mr. Williams]' or [shown] 'that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment.'" *Findlay*, 722 F.3d at 899 (quoting *Chelios*, 520 F.3d at 691). Qualified

immunity "protects all but the 'plainly incompetent and those who knowingly violate the law.'" *Chelios*, 520 F.3d at 691 (quoting *Hunter*, 502 U.S. at 227). Neither of these things can be said about Officers Chadd and Hallam's use of nonlethal force against Mr. Williams, given his suicidal, intoxicated, and continually threatening state. Although the tasers ultimately and tragically proved ineffective, their use was reasonably calculated to safely end the encounter while not causing any lasting harm to Mr. Williams, and no clearly established law shows that such force was excessive. *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1044-45 (6th Cir. 1992) (holding that the defendant officer was entitled to qualified immunity because "[t]he uncontested record indicates that [the officer] deployed the Taser in an effort to obviate the need for lethal force. Although in hindsight his choice proved tragic, we cannot say that [the officer's] use of non-lethal force to subdue a potentially homicidal individual transgressed clearly established law.").

Accordingly, Officers Chadd and Hallam are entitled to qualified immunity for their use of tasers against Mr. Williams and are therefore entitled to summary judgment on Mr. Williams' § 1983 excessive force claim based on their use of tasers against him.

### iii.    Deadly Force

The Court need not discuss at length Officers Thomas, Labhart, and Hallam's use of deadly force against Mr. Williams, as Plaintiffs' entire theory of liability for these officers' use of deadly force—that the Responding Officers created and used an unreasonable plan for handling the situation, the foreseeable consequence of which was Mr. Williams' death—has already been rejected.[30] [Filing No. 100, at ECF p. 52-55.] Other than this theory, Defendants

---

[30] As was the case for Plaintiffs' excessive force claim based on the use of tasers, only the Responding Officers who actually shot Mr. Williams can be liable for using deadly force. *See Harper*, 400 F.3d at 1062. Thus, for the same reasons discussed regarding the Responding

are correct that "absent from Plaintiffs' submission is any meaningful discussion of Mr. Williams' death or his conduct that precipitated his death." [Filing No. 116, at ECF p. 10.]

Plaintiffs' sole reliance on their deficient plan theory of liability is perhaps understandable given that, once Mr. Williams exited the bathroom with at least one knife raised and continually approached Officer Hallam, the officers could constitutionally use deadly force against Mr. Williams. The Seventh Circuit has consistently held that when, as here, an individual places law enforcement officers in imminent danger of death or serious bodily injury, the officers may use deadly force against the individual. *See Marion v. City of Corydon, Ind., 559 F.3d 700, 705 (7th Cir. 2009)* ("[I]t is reasonable for a law enforcement officer to use deadly force if an objectively reasonable officer in the same circumstances would conclude that the suspect posed a threat of death or serious physical injury to the officer or to others."); *Muhammed v. City of Chicago, 316 F.3d 680, 683 (7th Cir. 2002)* ("Deadly force may be used if the officer has probable cause to believe that the armed suspect . . .'poses a threat of serious physical harm, either to the officer or to others.'") (quoting *Tennessee v. Garner, 471 U.S. 1, 7 (1985)*); *Sherrod v. Berry, 856 F.2d 802, 805 (7th Cir. 1988)* (en banc) ("[W]hen an officer believes that a suspect's actions place[] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force.") (emphasis, citations, and quotation marks omitted). Accordingly, Officers Labhart, Thomas, and Hallam did not violate Mr. Williams' Fourth Amendment rights when they used deadly force against him, as an objectively reasonable officer would conclude that Mr. Williams—who had threatened to kill anyone who opened the bathroom door and was

_____

Officers who did not use tasers, Officers Chadd and Springstun are entitled to summary judgment on Plaintiffs' excessive force claim for the use of deadly force.

approaching Officer Hallam with a knife raised, [*see* Filing No. 101-17, at ECF p. 10; Filing No. 101-18, at ECF p. 8]—posed a threat of death or serious bodily injury to Officer Hallam.

Alternatively, Officers Labhart, Thomas, and Hallam are entitled to qualified immunity for their use of deadly force against Mr. Williams. It is Plaintiffs' burden to defeat qualified immunity once it is raised. *See Escobedo*, 702 F.3d at 404. Plaintiffs' only mention of qualified immunity with respect to the use of deadly force is as follows: "[I]t is clearly established long before these events that police cannot recklessly escalate a situation and provoke the need to use deadly force." [Filing No. 100, at ECF p. 57 (citing *Starks*, 5 F.3d at 234-35).] Again, the Court rejected this theory of liability—and Plaintiffs' reliance on *Starks* for this proposition—above and need not repeat that analysis here. Accordingly, Officers Labhart, Thomas, and Hallam are entitled to qualified immunity for their use of deadly force against Mr. Williams and are entitled to summary judgment on this aspect of his § 1983 excessive force claim.

The grant of summary judgment to Defendants on Plaintiffs' excessive force claims is in no way a statement that Mr. Williams' death was not tragic—it certainly was. However, Mr. Williams presented the Responding Officers with a very difficult situation, and they are entitled to qualified immunity for their actions taken in response to this situation. As the Seventh Circuit stated in *Bell*, and which could equally be said about this case: "It is easy in retrospect to say that officers should have waited, or should have used some other maneuver—these propositions cannot be falsified—but *Graham* makes it clear that the fourth amendment does not require second-guessing if a reasonable officer making decisions under uncertainty and the press of time would have perceived a need to act." 321 F.3d at 640. The Court grants the Responding Officers summary judgment on Plaintiffs' excessive force claims.

**B.      § 1983 Municipal Liability – Failure to Train Claim**

Plaintiffs assert a §1983 failure-to-train claim against Sheriff Fenwick and Cloverdale, arguing that each failed to adequately train their officers in handling suicidal and emotionally disturbed individuals, and that the deficient training led to Mr. Williams' death.  [Filing No. 45, at ECF p. 9.]

"[M]unicipalities cannot be held liable for § 1983 claims under a theory of respondeat superior."  *Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003) (alteration in original) (citation and quotation marks omitted).  Therefore, "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury."  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)).  Typically, municipal policies "include[] the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Id.*  But "[i]n limited circumstances, local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  *Id.*  Notably, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Id.*

Plaintiffs here advance only the failure-to-train theory of liability.  [*See* Filing No. 100, at ECF p. 58 (arguing that the municipal defendants "failed to adequately train their officers in dealing with suicidal and emotionally disturbed persons").]  Like other theories of municipal liability, to proceed under a failure-to-train theory, Plaintiffs must prove that the "municipality's failure to train its employees in a relevant respect . . . amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'"  *Connick*, 131 S. Ct.

at 1359; *accord* *Rice ex rel. Rice v. Correctional Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012). In the failure-to-train context, Plaintiffs can prove a municipality's deliberate indifference in one of two ways: (1) "when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation," or (2) "if it fails to provide further training after learning of a pattern of constitutional violations by the police." *Dunn v. City of Elgin, Ill.*, 347 F.3d 641, 646 (7th Cir. 2003) (citations omitted). Plaintiffs attempt to prove deliberate indifference pursuant only to the former method. [Filing No. 100, at ECF p. 59 (arguing that Plaintiffs can prove deliberate indifference without proving "a pattern of constitutional violations").]

The Supreme Court has characterized the Plaintiffs' chosen method of proving deliberate indifference as "single-incident liability." *Connick*, 131 S. Ct. at 1361 (quotation marks omitted). This method of proof derives from a hypothetical in *Canton*, and was subsequently summarized by the Supreme Court as follows:

> In *Canton*, the Court left open the possibility that, in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference. The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. Given the known frequency with which police attempt to arrest fleeing felons and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights, the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the highly predictable consequence, namely, violations of constitutional rights. The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.

*Id.* (citation and quotation marks omitted).

Plaintiffs' failure-to-train claim rises or falls with whether or not this case is sufficiently analogous to the *Canton* hypothetical. Defendants argue that this case is distinguishable; the Supreme Court recognized that "'[t]he *Canton* hypothetical assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force.'" [Filing No. 76, at ECF p. 25 (quoting *Connick*, 131 S. Ct. at 1363).] Contrary to that situation, Defendants say, the Responding Officers received relevant training. [Filing No. 76, at ECF p. 26.] Specifically, Sheriff Fenwick presents evidence that Officer Chadd received training at the Indiana Law Enforcement Academy "related to dealing with individuals who are emotionally disturbed, including those contemplating suicide." [Filing No. 77-1, at ECF p. 2; *see also* Filing No. 77-2, at ECF p. 1; Filing No. 77-13, at ECF p. 2.] And Cloverdale presented evidence that Officer Hallam also completed training established by the Indiana Law Enforcement Academy, including specific training on handling suicidal individuals. [Filing No. 81-1, at ECF p. 7; Filing No. 81-2, at ECF p. 4.]

Somewhat surprisingly, Plaintiffs' response ignores the *Canton* hypothetical altogether. [*See* Filing No. 100, at ECF p. 59-63.] Instead, they rely entirely on the reports of their two experts to prove their failure-to-train claim. First, they argue that their expert reports prove that "[d]ealing with suicidal and/or emotionally disturbed persons is a situation that will recur for police officers." [Filing No. 100, at ECF p. 59.] Defendants do not dispute that this is the case. Next, Plaintiffs turn to the core of their argument, where they again rely solely on their expert reports[31] to support their position that "[a] jury could find that the Putnam County Sheriff and Town of Cloverdale were deliberately indifferent to the need to train their officers in dealing with suicidal and/or emotionally disturbed persons." [Filing No. 100, at ECF p. 60.] According

---

[31] The Court again notes that it finds the reports referenced herein are not admissible, and that its discussion is an alternative ruling.

to Plaintiffs, a jury could so find because their experts make clear that "special police skills and abilities" are needed to effectively handle such individuals, and therefore "the need to develop policies for dealing with the mentally ill, and training officers in such policies, is of paramount importance." [Filing No. 100, at ECF p. 61 (citations and quotation marks omitted).] Despite this, say Plaintiffs, Dr. Ginger concluded that neither Putnam County nor Cloverdale have effective policies to deal with such individuals and that, based on Officers Chadd and Hallam's deposition testimony, their relevant training was "severely lacking." [Filing No. 100, at ECF p. 61-62.]

As they did regarding their excessive force claim, Plaintiffs act as if their expert reports can replace—or at the very least, allow them to ignore—the established legal standards governing their claim. *Connick* makes clear that the *Canton* hypothetical "assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force." 131 S. Ct. at 1365. Defendants presented evidence that Officers Chadd and Hallam had indeed received training specifically regarding how to handle suicidal individuals. [*See* Filing No. 77-1, at ECF p. 2; Filing No. 81-1, at ECF p. 7; Filing No. 81-2, at ECF p. 4; *see also* Filing No. 77-2, at ECF p. 1; Filing No. 77-13, at ECF p. 2.]

Plaintiffs do not directly confront Defendants' evidence that Officers Chadd and Hallam received relevant training, perhaps because they realize how problematic this fact is for their claim. Instead of assailing the training regime undergone by Officers Chadd and Hallam, Plaintiffs' experts denigrate Officers Chadd and Hallam's knowledge regarding the proper procedures for handling suicidal individuals based on the answers they provided to several questions on the subject during their respective depositions. [Filing No. 100, at ECF p. 61-62.] But Plaintiffs again futilely attempt to use their experts as a substitute for the legal standards

governing their claims. In the municipal liability context, "the focus must be on the [training] program, not whether particular officers were adequately trained." *Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997). The Supreme Court made this abundantly clear in *Canton*. *See* 489 U.S. at 390-91 ("In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.").

Therefore, what remains is Plaintiffs' argument that the training Officers Chadd and Hallam received was "severely lacking." [Filing No. 100, at ECF p. 61.] This is essentially an argument that the training they received could or should have been better. Like Plaintiffs' other arguments, this theory of municipal liability has been squarely rejected:

> The [plaintiff's] argument boils down to "no special training = deficient training." We cannot accept this equation. To do so would ignore the training the officers did receive. Chief Toomey testified that the basic recruit police training included a block of instruction on handling people who act abnormally, and mandatory post-academy and in-service training included scenarios involving abnormal behavior. It is against these "better or more" training scenarios that the Court warned in *City of Canton*, 489 U.S. at 391 ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct."). To conclude otherwise would be to subject all municipalities which employ police officers who attended either of the only two Illinois police training institutes to liability for "inadequate" training in handling abnormally behaving individuals.

*Palmquist*, 111 F.3d at 1345; *accord Estate of Lee v. City of Washington*, 2010 WL 4778725, *16 (S.D. Ind. 2010) (relying on *Palmquist* in rejecting the plaintiff's failure-to-train claim based on law enforcement's deficient training in handling suicidal individuals; "[a]s the City has provided the state mandated requirements for training for suicide and/or hostage situations, the

Plaintiff's 'better or more' argument must be rejected").[32]  In fact, the Seventh Circuit has explicitly stated that the training Officers Hallam and Chadd received—that from the Indiana Law Enforcement Academy—is "evidence that, as a matter of law, it was not the policy of [their municipal employers to] inadequately . . . train police officers." *Ross v. Town of Austin, Ind.*, 343 F.3d 915, 918 (7th Cir. 2003).

The Supreme Court recently reiterated this principle.  *See Connick*, 131 S. Ct. at 1363-64 ("But showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability.").  Moreover, following *Connick*, courts have found sufficient evidence of "single-incident liability" only where there was a complete absence of training on the relevant subject—just as the *Canton* hypothetical suggests.  *See, e.g., Thomas v. Cumberland Cnty.*, --- F.3d ----, 2014 WL 1395666, *7 (3d Cir. 2014) (holding that summary judgment was improper because the "corrections officers had no de-escalation or intervention training"); *Rosen v. King*, 913 F.Supp.2d 666, 680 (N.D. Ind. 2012) (denying summary judgment on the plaintiff's failure-to-train claim because there was no evidence that "the officers were trained on the constitutional limitations of excessive force").  This is certainly not the case here, as, again, it is undisputed that Officers Chadd and Hallam both had training on handling suicidal individuals.  [*See* Filing No. 77-1, at ECF p. 2; Filing No. 81-1, at ECF p. 7; Filing No. 81-2, at ECF p. 4.]

---

[32] In a less than well-developed argument, Plaintiffs rely on their expert Dr. Ginger's assessment that Putnam County and Cloverdale "have 'no effective policies guiding the police response to the mentally ill,'" to implicitly contend that it was as if no policy existed and that the absence of a specific policy can establish municipal liability.  [Filing No. 100, at ECF p. 61 (quoting Filing No. 101-5, at ECF p. 11).]  It is true that "the failure to make a policy itself may be actionable," but such a claim typically requires there to be a "pattern or a series of incidents of unconstitutional conduct."  *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993).  Because Plaintiffs have not even argued that such a pattern exists, or explained how this standard is otherwise met, they cannot establish municipal liability due to an alleged lack of a policy for handling mentally ill individuals.

In the end, this case is simply not the limited hypothetical situation envisioned in *Canton*. Officers Chadd and Hallam received specific training on handling individuals who were suicidal. Plaintiffs do not dispute this fact, and instead argue that Officers Chadd and Hallam's training was "severely lacking." [Filing No. 100, at ECF p. 61.] This is essentially an argument that Sheriff Fenwick and Cloverdale should provide better training. With good reason, courts have consistently rejected such an argument as the basis of a constitutional violation. As aptly noted by the Supreme Court, "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city could have done to prevent the unfortunate incident." *Connick*, 131 S. Ct. at 1363 (citation and quotation marks omitted). But the Supreme Court concluded that this fact is insufficient to demonstrate deliberate indifference and thus cannot be used to support a claim for municipal liability. *See id.* Accordingly, Sheriff Fenwick and Cloverdale are entitled to summary judgment on Plaintiffs' § 1983 municipal liability claim.

### C. State Law Claims

Although diversity jurisdiction is not present, it is possible that the Court may continue to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims.

This Court has supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Until the Court granted summary judgment against Plaintiffs on their federal claims, it was exercising supplemental jurisdiction over their state-law claims against Defendants because they arose from a common nucleus of operative fact. Now that the federal claims are gone, however, the Court must reevaluate. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise

supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); *Carlsbad Tech., Inc. v. HIF BIO, Inc.*, 556 U.S. 635, 639-40 (2009) ("Upon dismissal of the federal claim, the District Court retained its statutory supplemental jurisdiction over the state-law claims. Its decision declining to exercise [that] was not based on a jurisdictional defect but on its discretionary choice not to hear the claims despite its subject-matter jurisdiction over them.").

When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). It is well-established that the usual practice is to dismiss or remand the state supplemental claims without prejudice. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999).

The Court concludes that the factors it must consider weigh in favor of it continuing to exercise supplemental jurisdiction over Plaintiffs' state-law claims. This case has been pending in federal court for more than eighteen months, and, having analyzed Plaintiffs' federal claims at length—the factual bases for which are nearly identical to those for Plaintiffs' state-law claims— the Court is well familiar with the underlying facts of the remaining state-law claims. While it has no doubt that a state court could get up to speed, judicial economy favors this Court continuing to exercise jurisdiction, particularly since the parties have fully briefed the state law claims in the ten briefs filed with the Court. [Filing No. 75; Filing No. 80; Filing No. 82; Filing No. 84.] While comity weighs in favor of relinquishing supplemental jurisdiction, the parties cite the Court to the relevant Indiana law that the Court is capable of applying. Moreover, as discussed further below, the parties recognize that the legal standards the Court must apply to

certain aspects of Plaintiffs' state-law claims are identical to those the Court already applied to their federal claims. Therefore, the Court concludes that these factors weigh in favor of it continuing to exercise supplemental jurisdiction over Plaintiffs' state-law claims.

### 1. State Law Wrongful Death Claim

Plaintiffs' third claim is somewhat of a moving target. In their Amended Complaint, Plaintiffs asserted a wrongful death claim pursuant to Indiana Code § 34-23-1-1, alleging that the employees of the ISP, the IDNR, Cloverdale, and Sheriff Fenwick "caused the death of [Mr.] Williams." [Filing No. 45, at ECF p. 10.] Defendants move for summary judgment on this claim for at least two reasons: (1) the state-law claims are barred by Indiana law enforcement immunity, *see* Ind. Code § 34-13-3-3(8); and (2) Mr. Williams' contributory negligence precludes liability. [Filing No. 76, at ECF p. 29-35; Filing No. 81, at ECF p. 18; Filing No. 83, at ECF p. 14-18.] Sheriff Fenwick and Cloverdale also move for summary judgment on the ground that their respective employees—Officers Chadd and Hallam—cannot be liable for Mr. Williams' death due to their use of tasers against him. [Filing No. 76, at ECF p. 29; Filing No. 81, at ECF p. 18.] Any claim for damages from the taser use, they continue, would have to be pursued as a survival claim under Indiana Code § 34-9-3-4, which Plaintiffs did not plead and, in any event, Defendants say is mutually exclusive with a wrongful death claim. [Filing No. 76, at ECF p. 29.]

In response to these arguments, Plaintiffs clarify that their claim is one for the intentional tort of battery, making Defendants' law enforcement immunity and contributory negligence arguments irrelevant. [Filing No. 100, at ECF p. 64 ("[Plaintiffs'] claims are for battery.").] As to Defendants' arguments regarding the taser use, Plaintiffs simply disagree, arguing that a reasonable "jury could conclude that [Mr.] Williams' death was the natural and probable

consequence of the officers' plan to surprise [Mr.] Williams by opening the door and tasing him." [Filing No. 100, at ECF p. 66-67.]

In reply, Defendants agree with Plaintiffs that neither law enforcement immunity nor contributory negligence principles apply to battery claims, as battery is an intentional tort. [Filing No. 115, at ECF p. 24-25; Filing No. 116, at ECF p. 19-20.] But Defendants contend that summary judgment in their favor is appropriate on Plaintiffs' claim because: (1) the tasing of Mr. Williams was not the proximate cause of Mr. Williams' death, [Filing No. 115, at ECF p. 26], and (2) the use of deadly force was reasonable under the circumstances, and both parties agree that a battery claim cannot succeed if law enforcement's use of force against an individual was reasonable, [Filing No. 116, at ECF p. 20].

An actor commits a battery if "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person . . . and (b) a harmful contact with the person of the other directly or indirectly results." *Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608, 610 (Ind. 2007). A battery claim under Indiana law alleging excessive force by law enforcement is measured by the same standards set forth above for excessive force under the Fourth Amendment. *See Fidler v. City of Indianapolis*, 428 F.Supp.2d 857, 866 (S.D. Ind. 2006) ("Indiana's excessive force standard effectively parallels the federal [Fourth Amendment] standard."). Like the Fourth Amendment standard, Indiana law only permits a law enforcement officer to use "reasonable" force when effectuating an arrest. Ind. Code § 35-41-3-3(b). The Court need not repeat the Fourth Amendment reasonableness standard in detail here, as the Court set forth that standard above.

Furthermore, the parties agree that law enforcement immunity does not apply to Plaintiffs' battery claim. *See Wilson v. Isaacs*, 929 N.E.2d 200, 203-04 (Ind. 2010) (explaining

that "[i]f an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery" and that "law enforcement immunity . . . does not shield the government from liability for excessive force by police"); *see also Lessley v. City of Madison, Ind.*, 654 F.Supp.2d 877, 913 (S.D. Ind. 2009) ("The statutory law enforcement immunity does not bar plaintiffs' claims for assault and battery against the City of Madison."). And the parties also correctly recognize that contributory negligence is not a defense to intentional torts, such as battery. *See Wallace v. Rosen*, 765 N.E.2d 192, 199 n.4 (Ind. App. 2002) ("[C]ontributory negligence is not a defense to an intentional tort.").

As the Court did with Plaintiffs' excessive force claims, the Court will analyze each potential battery that allegedly caused Mr. Williams' death separately.[33]

a.     Officers Chadd and Hallam's Use of Tasers

Indiana's wrongful death statute permits the recovery of damages for an individual's death "[w]hen the death . . . is caused by the wrongful act or omission of another." Ind. Code § 34-23-1-1. Plaintiffs argue that Officer Hallam's tasing of Mr. Williams was the proximate cause of Mr. Williams' death. [Filing No. 100, at ECF p. 66-67.] In support of this position, Plaintiffs rely solely on their deficient plan theory rejected above, arguing that it demonstrates that a reasonable "jury could conclude that [Mr.] Williams'[] death was the natural and probable consequence of the officers' plan to surprise [Mr.] Williams by opening the door and tasing him." [Filing No. 100, at ECF p. 66-67.] The Court, however, agrees with Defendants that the evidence does not support Plaintiffs' theory of liability.

---

[33] Unlike for Plaintiffs' excessive force claims, the Court will not analyze whether the opening of the bathroom door was a battery. The act of opening the door alone did not cause "a harmful contact" with Mr. Williams and thus cannot constitute battery. *See Mullins*, 865 N.E.2d at 610.

First, Defendants are correct that Plaintiffs' reliance on a theory of liability resting on the Responding Officers' allegedly deficient plan does not establish the intentional tort of battery. [*See* Filing No. 115, at ECF p. 26.]  Indeed, Plaintiffs' argument is illustrative of their attempts to bob and weave around law enforcement immunity by recasting their claim as one of an intentional tort (battery), but after doing so, advancing a negligence theory—namely, the Responding Officers' deficient plan caused Mr. Williams' death—to prove causation.  But either way, Plaintiffs' claim fails.

The Indiana Supreme Court has held that the law enforcement immunity provision does not protect law enforcement from liability for conduct contrary to another statute; specifically in *Wilson*, there was no immunity if the "officer use[d] unnecessary or excessive force."  929 N.E.2d at 203-04.  Here, Plaintiffs do not even contend that the Responding Officers' allegedly deficient plan was contrary to any Indiana statute.  Accordingly, the Responding Officers are entitled to law enforcement immunity under Indiana Code § 34-13-3-3(8) for any theory of liability resting on their alleged negligence in developing a plan for handling the situation with which they were presented.[34]

Second, to the extent that Plaintiffs' argument is simply that Mr. Williams' death was foreseeably caused by Officer Chadd's use of a taser against him, the Court rejects this theory as unsupported by the evidence.  As explained above in rejecting Plaintiffs' deficient plan theory, it is undisputed that the purpose of tasing Mr. Williams was to ensure that he did not pose a threat to the Responding Officers by using nonlethal force to subdue him.  [*See, e.g.*, Filing No. 77-1, at ECF p. 6-7.]  Unfortunately, for reasons the evidence does not make clear, the tasers had no apparent effect on Mr. Williams.  [Filing No. 77-1, at ECF p. 7; Filing No. 101-17, at ECF p.

---

[34] Plaintiffs do not dispute that the Responding Officers were "acting within the scope of [their] employment" as required for law enforcement immunity to apply.  *See* Ind. Code § 34-13-3-3.

17.] But they certainly were not the cause of Mr. Williams' death. As explained above, after the Responding Officers attempted to subdue Mr. Williams with tasers, Mr. Williams took deliberate action to advance on Officer Hallam with at least one twelve-inch knife raised in the air. [*See, e.g.*, Filing No. 77-1, at ECF p. 8; Filing No. 101-17, at ECF p. 18.] The undisputed evidence is that this conduct led to the constitutionally reasonable use of deadly force against Mr. Williams.

For these reasons, Sheriff Fenwick is entitled to summary judgment on Plaintiffs' battery claim, as Officer Chadd only used a taser against Mr. Williams and thus cannot be held liable for wrongful death. Similarly, Cloverdale is entitled to summary judgment on Plaintiffs' wrongful death claim predicated on Officer Hallam's taser use.

<u>b.</u>     <u>Officers Hallam, Thomas, and Labhart's use of deadly force</u>

The Court need not discuss at length Plaintiffs' battery theory against the ISP, the IDNR, and Cloverdale for their respective officers' use of deadly force against Mr. Williams. Plaintiffs rightly recognize that their battery claim rises or falls with their § 1983 excessive force claims: "the issue is whether the officers used unreasonable force. If so, they are liable for battery. If not, they are not liable." [Filing No. 100, at ECF p. 64.] This is the case because "Indiana's excessive force standard effectively parallels the federal standard." *Fidler v. City of Indianapolis*, 428 F.Supp.2d 857, 866 (S.D. Ind. 2006) (citing *O'Bannon v. City of Anderson*, 733 N.E.2d 1, 3 (Ind. App. 2000)); *see Wilson*, 929 N.E.2d at 203-04 (explaining that "[i]f an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery"). For the reasons discussed above, Officers Hallam, Thomas, and Labhart's use of deadly force against Mr. Williams was constitutionally reasonable. Accordingly, they did not commit battery against Mr. Williams, and the Town of Cloverdale, the ISP and the IDNR are entitled to summary judgment on Plaintiffs' wrongful death claim.

## 2. *Negligent Infliction of Emotional Distress*

Plaintiffs' final claim is brought on behalf of Tyler Williams, alleging that the ISP, the IDNR, Cloverdale, and Sheriff Fenwick are liable for negligent infliction of emotional distress as a result of the emotional distress caused by witnessing his father's death. [Filing No. 45, at ECF p. 11.]

Defendants move for summary judgment on this claim on the grounds that they are all entitled to law enforcement immunity under Indiana Code § 34-13-3-3(8), as it is undisputed that law enforcement were acting within the scope of their employment and enforcing the law during the encounter. [Filing No. 76, at ECF p. 29-33.] Specifically, Defendants contend that they had probable cause to arrest Mr. Williams both because he committed felony intimidation and because the law permitted them to apprehend Mr. Williams due to the fact that he presented signs of mental illness and was dangerous. [Filing No. 76, at ECF p. 30 (citing Ind. Code § 12-26-4-1; *Savieo v. City of New Haven*, 824 N.E.2d 1272 (Ind. App. 2005)).] Plaintiffs do not dispute whether the Responding Officers were acting within the scope of their employment or whether they had probable cause to arrest Mr. Williams during the encounter. Instead, relying solely on *Wilson*, Plaintiffs contend that law enforcement immunity does not apply because "the tortious conduct underlying Tyler's claim is battery." [Filing No. 100, at ECF p. 65.]

Like their wrongful death claim, Plaintiffs' negligent infliction of emotional distress claim lacks clarity. Plaintiffs' Amended Complaint explicitly characterizes this claim as one for "Negligent Infliction of Emotional Distress." [Filing No. 45, at ECF p. 11.] Plaintiffs' response brief, however, refers to this claim as one for "tortious infliction of emotional distress," since "the tortious conduct underlying [this] claim is battery." [Filing No. 100, at ECF p. 65.] But by reciting the elements of a negligent infliction of emotional distress claim and explicitly stating

that this claim is made under Indiana's bystander test (a particular method of proving a negligent infliction of emotional distress claim), Plaintiffs make clear that the claim is one for negligent infliction of emotional distress. [Filing No. 100, at ECF p. 65 (citing *Groves v. Taylor*, 729 N.E.2d 569, 573 (Ind. 2000)).] Plaintiffs are correct, however, that the emotional distress forming the basis of such a claim can be caused by "negligent or otherwise tortuous [sic] conduct," *Groves*, 729 N.E.2d at 573, and battery of course qualifies as other tortious conduct.

The fact that Tyler's claim is predicated on an underlying battery, however, dooms his claim. As the Court already held with respect to Plaintiffs' wrongful death claim predicated on battery, none of the Responding Officers committed battery against Mr. Williams when they used constitutionally permissible deadly force against him. The Indiana Supreme Court has made clear that a negligent infliction of emotional distress claim requires the breach of some other legal duty. *See Spangler v. Bechtel*, 958 N.E.2d 458, 466 (Ind. 2011). Because there was no battery—the other legal duty Tyler contends was breached—there can be no claim for negligent infliction of emotional distress. *See id.* Put differently, negligent infliction of emotional distress is not "an 'independent' tort," *id.* at 466 n.5, and having failed to prove the predicate tort of battery, Tyler's negligent infliction of emotional distress claim also fails. Accordingly, the ISP, the IDNR, Cloverdale, and Sheriff Fenwick are entitled to summary judgment on Tyler's negligent infliction of emotional distress claim.[35]

---

[35] The parties argue at length regarding the applicability of law enforcement immunity to this claim. [Filing No. 115, at ECF p. 27-28; Filing No. 124, at ECF p. 14.] Because the Court concluded that Plaintiffs failed to prove the underlying battery, precluding a claim for negligent infliction of emotional distress based on that battery, the Court need not delve into the parties' arguments regarding the applicability of law enforcement immunity.

**IV.**

**CONCLUSION**

For the reasons explained, Defendants are entitled to summary judgment on all Plaintiffs' claims.  Specifically, the Court **GRANTS** Officer Chadd and Sheriff Fenwick's Motion for Summary Judgment, [Filing No. 75], **GRANTS** Cloverdale's Motion for Summary Judgment, [Filing No. 80], **GRANTS** the IDNR, the ISP, and Officers Labhart, Springstun, and Thomas' Motion for Summary Judgment, [Filing No. 82], and **GRANTS** Officer Hallam's Motion for Summary Judgment, [Filing No. 84].  Finally, the Court **DENIES** Officer Chadd's and Sheriff Fenwick's Motion to Strike.  [Filing No. 125.]  Final Judgment will issue accordingly.

**<u>Distribution via ECF only to all counsel of record.</u>**